**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| KELLY J. VAY | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | NO. 14-769 |
| | : | |
| ROBERT HUSTON, *et al.* | : | |

**KEARNEY, J.**                                                                          **December 16, 2016**

## AMENDED MEMORANDUM[1]

Social commentators remind us our secular society is becoming increasingly desensitized to public discourse sprinkled with formerly forbidden curse and slang words. We allow for these differences but may elect to ignore in the public airwaves and avenues. At work, different rules apply to ensure the language and conduct is not so severe or pervasive to be considered hostile and employment actions are not discriminatory based on, among other things, an employee's gender. As taxpayers, we may also expect our public officials and servants to be respectful of their co-workers under the Law at least to the same extent as private workplaces. We are also aware there are at least two sides to every workplace interaction often driven by personal animus and poor temper. But reading the facts in the most favorable manner for the former female public employee terminated as a disciplinary measure, we largely deny the public employer's motion for summary judgment in the accompanying Order. We find she exhausted her pre-suit remedies and her timely claims require the jury evaluating disputed facts of gender discrimination, retaliation and hostile work environment arising in an apparent male dominated Allegheny County Medical Examiner's Office self-described as a "locker room" where "old timers" "give [attractive women] a really hard time," and where "the women [co-workers] are going to be jealous" of them, and the "men are going to be pigs."

## I.    Facts in the light most favorable to Ms. Vay.[2]

Allegheny County hired Kelly J. Vay at its Medical Examiner's Office on March 15, 2009.[3]  During Ms. Vay's employment, men managed the Medical Examiner's Office: Stephen Pilarski served as Manager of Administration from February 2007 to July 2012[4];  Robert Huston served as Laboratory Director until July 2012, when he took over Manager Pilarski's role as Manager of Administration[5];  Michael Baker served as Director of Morgue Operations from April 2013 to December 31, 2013[6];  Michael Chichwak served as Manager of Investigations from March 2011 to July 2014[7]; and, Ms. Vay's direct supervisors included, among others, Forensic Supervisors Anthony Bofo and Richard Lorah.[8]   All but one of Ms. Vay's forensic supervisors were male.[9]

During Ms. Vay's employment, investigators in the Medical Examiner's Office noticed management treated Ms. Vay less favorably than men.  Investigator Fred Manno swears he noticed management had a "vendetta" against Ms. Vay.[10]  "For example, supervisor Anthony Bofo could open his mouth expresses [sic] opinions and make suggestions without being reprimanded or disciplined but if Vay failed to dot every 'i' or cross every 't' she would get yelled at or disciplined."[11]  Based on his experience at the Medical Examiner's Office, "a male forensic investigator could get away with violating a policy or rule or practice but in the same circumstances, Kelly Vay would be disciplined."[12]  Investigator Curtis Williams swears men were treated better than women in the Medical Examiner's Office.[13]  Investigator Alison Bixby swears the employer treated men better and with more respect than women.[14]

Shortly after the County hired Ms. Vay in 2009, Manager Pilarski warned Ms. Vay and investigator Jennifer Sullivan "as attractive females" they were going to have a "hard way" ahead of them, but with their backgrounds, they would "be able to take it."[15]  Manager Pilarski

explained that "old timers" will "give you a really hard time," "the women are going to be jealous" of them, and the "men are going to be pigs."[16]

Co-workers subjected female investigators including Ms. Vay to sex-based comments. Employees very commonly engaged in "locker room talk" about female investigators including comments about their appearance and their clothing choices.[17]  When Ms. Vay returned to work in January 2010 following the birth of her daughter, a coworker called Ms. Vay a "c**t" to Ms. Sullivan and threatened to physically harm Ms. Vay, stating, "If that [c**t] says one more thing, I swear I'm going to slap her in the face."[18]

### Ms. Vay's July 2010 warning and 5-day suspension.

The male Management disciplined Ms. Vay for speaking out against sexist comments.  In July 2010, while Ms. Vay and a male investigator were on a scene call with a large deceased victim, a police officer on the scene stated women "shouldn't or can't do this job" and laughed because the investigators had to lift the large male.[19]  Ms. Vay replied women could do the job and continue to do it on a daily basis.[20]  Management disciplined Ms. Vay for her conduct on the scene, giving her a written "oral" warning and advising her to act professionally when confronted with this situation.[21]

The County disciplined Ms. Vay in part based on gender-based stereotypes.  In July 2010, Ms. Vay and Ms. Sullivan stopped at a Wal-Mart store to use the bathroom, leaving a body unattended in the van.[22]  The Medical Examiner's Officer had a practice permitting investigators to leave bodies unattended if an investigator had to use the bathroom, and no rule prohibited this stop.[23]  Management charged Ms. Vay and Ms. Sullivan for leaving a body in the van unattended. Management also charged Ms. Vay with using a County vehicle for allegedly "shopping" at this Wal-Mart store while on duty.[24]  Ms. Vay denied shopping.[25]  After seeking and failing to find

video footage proving Ms. Vay had been shopping, Director Huston recommended Ms. Vay be terminated, and Manager Pilarski told Ms. Vay, "[You] should be grateful that the cameras within [Wal-Mart] didn't work, or both you *bitches* would have been fired."[26]  Management insisted Ms. Vay and Ms. Sullivan must have been shopping, stating, "Well, what else would a female do in Wal-Mart but shop?"[27]

The County suspended Ms. Vay for five days for leaving the body unattended and using a County vehicle for personal use by shopping at Wal-Mart.[28]  The rule cited in the suspension letter did not prohibit Mr. Vay's conduct, but instead provided instructions for using a fuel card to refuel County vehicles.[29]

***November 2010 physical threat against Ms. Vay and her subsequent 1-day suspension.***

In November 2010, a coworker physically threatened Ms. Sullivan and another female employee.[30]  Mr. Longo threatened to fight Ms. Sullivan, telling her to "bring it outside, bitch."[31]  Mr. Longo then threatened Ms. Vay, stating "You can bring it outside, too . . . . I'm going to kick both your asses . . . Bring it outside.  I'll kick your ass like a man, too.  If that's how you want to act, I'll kick your ass like a man."[32]

Director Huston and Manager Pilarski issued the same discipline to Ms. Sullivan and Mr. Longo, even though they acknowledged Mr. Longo initiated the confrontation.[33]  Manager Pilarski told Ms. Vay, "I thought we'd get to fire you on this one . . . we couldn't  . . . . couldn't. It's a good thing we didn't have voice [recording] because we probably would have been able to do something."[34]

Soon after this incident, Ms. Sullivan complained in writing to the male Management about having to work in an environment where she and Ms. Vay are threatened, verbally attacked, and made to feel unsafe and uncomfortable in the workplace.[35]  Ms. Sullivan and Ms.

Vay spoke to Ms. Nicole Nagle in Human Resources, stating they did not feel comfortable with having Manager Pilarski and Director Huston take part in the investigation.[36]  They told Ms. Nagle "Management was 'attacking us girls.'"[37]

Management did not address Ms. Sullivan's complaint, but instead required her to work with Mr. Longo the next day.[38]  When Ms. Vay asked Manager Pilarski why Ms. Sullivan received the same discipline as Mr. Longo, Manager Pilarski put his hand up a few inches from her face and screamed, "Bitch, this is none of your business.  It has nothing to do with you."[39]  When Ms. Vay reacted telling Manager Pilarski to get his "hand out of [her] face," he sent her home for the rest of the day without pay.[40]  According to Supervisor Bofo, Manager Pilarski screamed and yelled at Ms. Vay until she walked out of the building, which he found unacceptable.[41]

### Derogatory sex-based comments directed toward Ms. Vay.

In May 2011, a male coworker stated Ms. Sullivan and Ms. Vay were dressed like whores.[42]  When Ms. Vay complained to Director Huston, he replied, "Do you think you look like a whore?"[43]  Management did not discipline any employee for this comment.[44]

Over the course of a few months in 2011, Ms. Vay and Ms. Sullivan overheard coworkers referring to their shift as the "c**t crew" on a number of occasions.[45]  At the time, Ms. Vay's shift had four female investigators and one male investigator.[46]  Ms. Vay's supervisor, Supervisor Lorah, overhead the comment but "blew if off or swept it under the rug" because he "didn't feel it was important enough to tell someone about."[47]  When Ms. Vay complained to management about the "c**t crew" comments, either Manager Pilarski or Manager Chichwak asked her, "[Were you] acting like a c**t?"[48]  Management did not discipline any employee for making these comments, and Ms. Vay continued hearing the comment even after she complained.[49]

***Ms. Vay complains to management.***

On July 12, 2011, Ms. Vay sent an email on behalf of herself and two other female investigators to Manager Pilarski, Director Huston, and Manager Chichwak complaining of mistreatment.[50]  Ms. Vay specifically complained about "derogatory statements" including the "whores" and "c**t crew" slurs against them.[51]  Ms. Vay also complained of inconsistent treatment and holding them to different standards compared to other employees.[52]

On July 19, 2011, after not receiving a response for a week, Ms. Vay forwarded the same email to Ms. Nagle in Human Resources.[53]  Ms. Nagle responded to Ms. Vay the following day stating Manager Pilarski had been looking into their concerns, and assured her Manager Pilarski would follow up with her following the investigation.[54]  At some point, Ms. Nagle told Ms. Vay the investigation had closed, but the results of the investigation were "none of [her] business."[55]

***Ms. Vay's September 2011 suspension.***

Ms. Vay swears, during 2011, "the tension and stress in the [Medical Examiner's] Office was so bad for me and Ms. Sullivan that we were concerned we could be fired at any moment."[56]  According to Ms. Sullivan, the work environment was "stressful all of the time" and "hateful."[57]

On September 2, 2011, Ms. Vay and Ms. Sullivan told Manager Pilarski they would not speak to him without a union representative of their choice because they believed the current union representative had a bias against them.[58]  Manager Pilarski locked them out of the conference room and told them to get out of his face.[59]  Manager Pilarski then "came storming up the hallway yelling at" Ms. Vay and Ms. Sullivan, threatened to fire them, and called Ms. Vay a bitch.[60]

Management suspended Ms. Vay and Ms. Sullivan following this meeting, stating they "became very loud, disrespectful, unprofessional and insubordinate in voicing" their opinions.[61]

Ms. Sullivan testified Manager Pilarski's conduct intimidated her, and she resigned following this event.[62] Ms. Sullivan did not feel she could handle the stress of another meeting.[63]

### Ms. Vay's March 2012 five-day Suspension.

During 2010 and 2011, Ms. Vay and Ms. Sullivan used their down time to work on identifying bodies and had set up and identification network, which management initially supported as a "great idea."[64] On August 19, 2011, however, management warned Ms. Vay and Ms. Sullivan they would be disciplined if they continued to work on the project.[65]

On February 27, 2012, Ms. Vay received an email positively identifying the remains of a body.[66] Concerned management may misinterpret the email as if she had continued to work on the project, she immediately showed and explained the letter to Director Huston.[67] Mr. Huston did not understand Ms. Vay's explanation, refused to provide Ms. Vay a copy of the document, and told her she "should have been locked up" because she had voice-recorded prior meetings.[68] Director Huston then abruptly walked away.[69]

After Director Huston walked completely out of the office area, Ms. Vay began a conversation with a female investigator, stating "this place is full of cowards."[70] Director Huston heard this remark, came back into the office, and told Ms. Vay to go home.[71] Ms. Vay asked for a reason, but he did not reply.[72] Ms. Vay ultimately received a five-day suspension.[73]

Male employees cursed at male Management but Management would not discipline them. For example, Mr. Manno swore at management on almost a daily basis.[74] He once called Director Huston a "f**king moron" to Manager Chichwak, but the County never disciplined him.[75] Mr. Manno "said 'f**k off' all of the time to management."[76] The County never disciplined him for this conduct.[77]

### *Supervisor Bofo's complaint on behalf of Ms. Vay.*

The day after Ms. Vay's March 2012 five-day suspension, Supervisor Bofo sent an email to Management, including Manager Pilarski, Director Huston, and Manager Chichwak complaining about the administration's unfair treatment of Ms. Vay:

> I am appalled over the continuous actions that this administration is taking against Inv. Vay. We have numerous employees that on a given day do not perform their job functions or perform those functions poorly and nothing like the discipline what I have seen with Inv. Vay has happened to others. I have sent numerous documented emails concerning investigators as well as supervisors who one [sic] a continuous basis fail to perform their job functions properly or not at all. Inv. Vay is probably the finest and most thorough investigator that this office has from veteran employees to new employees.[78]

> Inv. Vay is well trained . . . . a true asset to this office, and her professionalism and work ethic speak for themselves. I believe [sic], that this office needs to set aside some of its egos and high personalities, and form a well developed plan to move this office in the right direction and into modern times. It pains me to sit back and watch this horrendous chain of events take place from this administration, and watch the employees who need to be disciplined sit back and watch the show. I watched this fiasco unfold from the very beginning . . . . who is going to discipline this administration for the tactics and bullying it has shown on a constant basis on some of this office's finest employees?[79]

There is no evidence Management responded to Supervisor Bofo's complaint. At some point, Manager Pilarski and Director Huston told Supervisor Bofo to stay away from Ms. Vay because she would "drag him down."[80]

### *March 2012 false accusations.*

On March 22, 2012, Management accused Ms. Vay of several work infractions, including failing to timely enter follow-up information, disclosing confidential information to the media, and failing to enter a report into the computer system, and directed her to attend a "Loudermill

Hearing" on March 30, 2012.[81]  Ms. Vay describes these accusations as false and misleading, and the County did not discipline her following the hearing.[82]

The work environment "continued to be highly stressful" for Ms. Vay and "Management seemed to target anyone who seemed friendly with me and/or female investigators Allison Bixby and Melissa Bogoevski."[83]

### Letter to the County Executive draws media attention.

On April 5, 2013, Ms. Vay sent a letter to County Executive Rich Fitzgerald, complaining about a lack of trust between operations/investigations and management, stemming from "a long history of preferential treatment, discrimination, negligence, and complete disregard for the citizens of Allegheny County."[84]  Ms. Vay also sent her letter to the media.  On April 8, 2013, the Tribune Review published an article entitled, "Investigators claim 'lack of trust' in medical examiner's office."[85]  Management believed Ms. Vay had been "behind" the article.[86]

### Ms. Vay's 2013 verbal and written reprimands.

In April 2013, Director Baker began as Manager of Operations in the Medical Examiner's Office.[87]  Although he had a sign-up sheet to speak with all of the investigators, Director Baker did not include Ms. Vay.[88]

On May 10, 2013, Director Baker charged Ms. Vay with violating a policy prohibiting interns from entering a crime scene.[89]  Ms. Vay received a verbal reprimand for this offense.[90]  Ms. Bogoevski characterized the policy regarding interns as "very unclear" due to the lack of a standard operating procedure and mostly depending on the supervisor on duty.[91]  Management did not discipline male investigators for taking interns into a crime scene unless the male investigator and Ms. Vay were associated.[92]  For example, Mr. Williams and Mr. Manno took

interns into a scene but Management never disciplined them, even though the interns appeared in crime scene photographs.[93]

Director Baker also charged Ms. Vay with violating the crime scene drug policy because she did not deliver medicine from the scene to the Medical Examiner's Office.[94] Ms. Vay received a written reprimand for this offense.[95] Ms. Bogoevski described the crime scene drug policy as "Unclear, because it changed a lot. . . . You would ask the supervisors. They didn't know, so there was never a clear understanding."[96] Male investigators who did not bring back medication were only disciplined if they accompanied Ms. Vay.[97]

In 2013, Director Baker asked investigators to bring in medications or drugs found near a crime scene body but not to count the number of pills in a medication bottle.[98] This posed an issue because a police officer or detective at the scene would not sign the evidence bag without counting the medication.[99] Ms. Vay raised this issue during a meeting with the investigators, and Director Baker—instead of discussing the issue—responded she would be disciplined if she counted the pills.[100]

### *Second letter to the County Executive gets media attention.*

On August 1, 2013, the investigators in the Medical Examiner's Office sent another letter to County Executive Fitzgerald, indicating the County and Management has not addressed the issues described in their April 2013 letter.[101] They stated the "department remains without any formal Standard Operating Procedures, which has led to further discrimination and preferential treatment."[102] Two days letter, the Pittsburgh Tribune published an article regarding the letter entitled, "Allegheny County's autopsy office called lax."[103]

On August 9, 2013, Director Huston sent an email to the investigators regarding the letter and newspaper article and invited employees to approach him or Director Baker "about any

concerns you have about the operations of the office. Our doors have always been open to you."[104]

***Ms. Vay's August 2013 26-day suspension.***

On August 9, 2013, Ms. Vay had a meeting with Ms. Bogoevski and Director Baker.[105] Director Baker confronted Ms. Bogoevski and Ms. Vay "from his desk screaming" about a work issue relating to an email from Director Huston.[106] Ms. Vay asked Director Baker if Director Huston could come to the office and clarify what he meant in his email, but instead Director Baker told her to leave the building altogether, which she did.[107] As Ms. Vay left, she opened the door and the handle struck the wall causing a hole where there had been a previous indentation.[108] Ms. Vay did not intend to cause this damage.[109] Even so, Director Baker charged Ms. Vay with "disorderly conduct" and "causing property damage to a county facility" for this incident.[110] Ms. Vay ultimately received a 26-day unpaid suspension for this incident.[111] She also signed a "last chance agreement" admitting she violated work rules.[112] She specifically admitted to causing property damage and behaving "in a disorderly manner with the Manager of Operations in his office and in other areas of the building, resulting in the employee being directed to leave the workplace."[113]

The County did not discipline other employees allegedly engaging in property damage. Mr. Manno admits he once inadvertently poked a hole in a GPS unit with a pencil, but he never received discipline about it even though his supervisors knew he did it.[114]

The County also did not discipline at least one other employee for engaging in conduct which could be characterized as disorderly. According to Ms. Bogoevski, during her probationary period in 2012,

> [Mr.] Manno had a tantrum, which everybody in the office
> apparently is used to. . . . I was scared shitless. I was brand new.

11

Never came from an office where it was okay for anybody, male or female to yell, throw things, scream, cuss, slam down phones. Yet . . . here I am being exposed to this type of childish behavior by a male, Fred Manno, and [Forensic Supervisor] Richard Lorah comes over to my desk and says, It's okay, he does this every day. You'll get used to it. You're lucky he's not throwing things such as scissors.[115]

### *The County places Ms. Vay on paid administrative leave.*

On November 23, 2013, Mr. Longo began working on a complicated case at the end of his shift.[116] Mr. Longo handed the case over the Supervisor Lorah, who asked both Ms. Bogoevski and Ms. Vay—before their shifts started—if they "wanted" to take the case.[117] Both declined, but Supervisor Lorah left the case on the back of Ms. Bogoevski's chair.[118] Ms. Vay and Ms. Bogoevski then worked on the case, completing all necessary paperwork.[119]

Unbeknownst to Ms. Vay or Ms. Bogoevski, Supervisor Lorah complained to Manager Chichwak and Director Baker, accusing them of being disrespectful.[120] On November 30, 2013, Management ordered Ms. Vay and Ms. Bogoevski to appear at a Loudermill hearing on December 2, 2013.[121] Before the hearing, Director Huston created a plan for escorting Ms. Vay outside of the building to be fired immediately after the hearing and emailed the plan to Manager Pilarski and Director Baker.[122] Director Huston also sent a separate email to Manager Pilarski asking for Ms. Vay's email account to be preserved and stating, "As you are aware, Ms. Kelly Vay will be terminated today following her Loudermill hearing."[123] Management also preemptively drafted a termination letter which purported to be based on the findings of the Loudermill hearing.[124]

At the Loudermill hearing, Ms. Vay and Ms. Bogoevski showed Director Baker an email from Supervisor Lorah recanting his insubordination charges.[125] Ms. Bogoevski also showed Director Baker evidence she and Ms. Vay completed the work.[126] In response, Director Baker

became angry, rose up, came halfway across the table at Ms. Vay and Ms. Bogoevski, and started yelling.[127]  Director Baker's outburst frightened Ms. Vay and Ms. Bogoevski.[128]  The union representative called for a break in the meeting and Director Baker stormed out of the room to Director Huston.[129]  When Director Baker returned, he declared the hearing over.[130]  Ms. Vay returned home.

Shortly after the hearing, Mr. Williams saw Director Huston angrily "ranting and raving" about what had happened.[131]  Mr. Curtis heard Director Huston say, in reference to Ms. Vay, "[S]he's not coming back into this office.  I don't care what I have to do, but she will not step foot in this office again."[132]

The following day, Ms. Vay received a letter from Director Baker stating the Medical Examiner's Office would not pursue discipline against Ms. Vay for the alleged violations, but Ms. Vay "will remain on paid administrative leave until further notice."[133]  The letter did not provide a reason for placing Ms. Vay on paid administrative leave.[134]  No one ever told Ms. Vay why Director Baker placed her on paid administrative leave.[135]

On December 5, 2013, Director Baker sent an email to Director Huston attaching a Loudermill notice for Ms. Vay based on "email issues."[136]  Director Baker indicated he did not set a firm date for the hearing because the district attorney's office had to investigate the email issues themselves.[137]  Ms. Vay learned during this litigation the district attorney's office investigated Ms. Vay for leaking information in a high profile case to the media.[138]  The Medical Examiner's Office did not conduct its own investigation.[139]  The County never disciplined her for any conduct relating to the district attorney's office investigation, and Ms. Vay denies she leaked information.[140]

In mid-January 2014, the County offered Ms. Vay a position as an investigator in the public defender's office.[141]  It is unclear from the record whether the district attorney's office's investigation remained ongoing when the County made this offer.  Ms. Vay rejected the offer.

The County paid Ms. Vay until March or April 2014.[142]  On March 31, 2014, a psychiatrist diagnosed Ms. Vay with generalized anxiety disorder and prescribed her anti-anxiety medication and counseling.[143]  Ms. Vay applied for leave under the Family Medical Leave Act, which the County granted.[144]  Ms. Vay requested an extension, but the County denied it.[145]  The County discharged Ms. Vay on December 16, 2014.[146]

## II.        Analysis

Ms. Vay sued Director Huston, Manager Pilarski, Director Baker, and Manager Chichwak ("Individual Defendants") for gender discrimination, hostile work environment, and retaliation claims under 42 U.S.C. § 1983.  She sued the County for gender discrimination, hostile work environment, and retaliation claims under Title VII of the Civil Rights Act of 1964[147] and the Pennsylvania Human Relations Act ("PHRA").[148]  Both the County and Individual Defendants moved for summary judgment arguing Ms. Vay failed to administratively exhaust her Title VII and PHRA claims, some of her claims are untimely, and her claims fail as a matter of law. [149]  In the accompanying Order, we deny the County's and Individual Defendants' motions as to claims other than the §1983 retaliation claim as there are genuine issues of material fact requiring a jury's evaluation of credibility.

### a.  Ms. Vay timely exhausted administrative remedies for the purposes of her Title VII and PHRA claims.

The County contends Ms. Vay failed to exhaust her administrative remedies under Title VII and the PHRA as to claims not raised in her EEOC charge of discrimination, including her unlawful termination claim.[150]  Ms. Vay counters the claims arising from the following discrete

acts satisfy the administrative exhaustion requirement: (1) August 20, 2013 26-day unpaid suspension; (2) December 3, 2013 indefinite unpaid administrative leave; and (3) December 16, 2014 termination.[151]

Under Title VII, "[t]he parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of proceedings before the EEOC."[152] Vay's claims must "fall 'fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom.'"[153]

The exhaustion requirement does not necessarily require a plaintiff to file a new administrative complaint following each allegedly discriminatory act.[154] In *Waiters*, the plaintiff alleged retaliation in her administrative complaint but did not specifically allege retaliatory discharge because she had not yet been discharged.[155] The EEOC investigation, however, uncovered evidence of retaliatory intent based on the employer's conduct.[156] Our Court of Appeals held although the administrative complaint alleged different discriminatory acts and officials, "the core grievance—retaliation—is the same" in both the administrative complaint and the lawsuit, and the allegations in the lawsuit fell within the scope of the administrative investigation.[157] Under these circumstances, the EEOC's "policy of promoting conciliation would not be furthered by allowing the defendants to delay having to answer in court for retaliatory action allegedly taken against appellant for asserting her rights."[158]

In *Kerns v. Drexel University*, Judge Yohn similarly held the employee exhausted administrative remedies under similar circumstances.[159] The employee, before discharge, filed an administrative complaint alleging racial discrimination and retaliation.[160] The employee later sued his employer for racially discriminatory and retaliatory termination.[161] Judge Yohn found

the case akin to *Waiters* because "the core grievances of this lawsuit, racial discrimination and retaliation resulting in termination, substantially overlap" with the allegations in the employee's administrative complaint.[162]  This case presented a "stronger basis" for exhaustion than *Waiters* because the alleged discriminatory actors were the same.[163]  "The only difference between the [administrative complaint] and the [federal complaint] was the specific act of discrimination and retaliation alleged in the latter, Kerns' termination."[164]

We similarly find Ms. Vay exhausted her claims for sexually discriminatory and retaliatory termination.  In her EEOC charge, which she dual filed with the Pennsylvania Human Relations Commission, Ms. Vay alleged gender discrimination and retaliation.[165]  She filed the charge while on paid administrative leave following a hearing with the County resulting in a decision in her favor.[166]  Ms. Vay alleged she feared the County would illegally discharge or demote her upon returning in light of Director Huston's comment before the hearing: "That chick is not going to step foot in this building again."[167]  The core grievance in her EEOC charge and her federal lawsuit is the same: gender discrimination and retaliation.  The alleged discriminatory actors are also the same.  Ms. Vay's unlawful termination claims present a stronger case for exhaustion than *Kerns* because Ms. Vay mentioned in her EEOC charge the County would likely terminate her employment, which it did.  Ms. Vay also specifically raises her 26-day suspension and her placement on paid administrative leave in the EEOC charge.[168]  Ms. Vay sufficiently exhausted her administrative remedies.

**b. Ms. Vay's claims are not barred by a statute of limitations.**

Ms. Vay's claims under Title VII, the PHRA, and § 1983 must satisfy timing requirements.[169]  For the purposes of statute of limitations, we distinguish between discrete acts and nondiscrete acts.

*Discrete acts*

"Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."[170]  A discrete act "constitutes a separate actionable unlawful employment practice"[171] and "must be raised within the applicable limitations period or they will not support a lawsuit."[172]  A discrete act includes "termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, wrongful accusation."[173]

Ms. Vay seeks relief for three discrete acts: (1) August 20, 2013 26-day unpaid suspension; (2) December 3, 2013 indefinite paid leave; and (3) December 16, 2014 termination.[174]  Under the PHRA, Ms. Vay must file an administrative complaint within 180 days of the alleged act of discrimination.[175]  Under Title VII, Ms. Vay must file an administrative complaint within 300 days of the unlawful employment practice.[176]  Ms. Vay filed her EEOC charge on January 21, 2014.  One hundred eighty days before January 21, 2014 is July 25, 2013.  Three hundred days before January 21, 2014 is March 27, 2013.  Ms. Vay's filing of her EEOC charge satisfies the PHRA and Title VII timing requirements as to these discrete acts because these acts occurred after July 25, 2013.

Ms. Vay's § 1983 claims are "governed by the statute of limitations that applies to personal injury tort claims in the state in which such a claim arises."[177]  Ms. Vay's claims arose in Pennsylvania.  Pennsylvania law requires a plaintiff sue for personal injury claims within two

years of the accrual of the claim.[178]  Ms. Vay filed this lawsuit on June 16, 2014,[179] meaning she can only pursue claims arising after June 16, 2012.  As all of the discrete acts occurred after June 16, 2012, Ms. Vay's § 1983 claims for these three discrete acts are not barred by the statute of limitations.

### *Nondiscrete acts*

Nondiscrete discriminatory acts—which are not individually actionable—may be aggregated to form a hostile work environment claim under the continuing violation doctrine.[180] "[S]uch acts "can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period."[181]  To bring in nondiscrete acts before the limitations period under the continuing violation doctrine, Ms. Vay must show: (1) at least one act occurred within the filing period; and (2) the harassment is "more than the occurrence of isolated or sporadic acts of intentional discrimination."[182]  In determining whether the harassment is part of a "persistent, ongoing pattern," we consider a non-exhaustive list of factors, including the subject matter and frequency of the underlying acts.[183]  Subject matter is defined as "whether the violations constitute the same type of discrimination."[184]  "[I]ndividually actionable allegations cannot be aggregated" for the purposes of the continuing violation doctrine.[185]

Ms. Vay provides sufficient evidence of a persistent, ongoing pattern of nondiscrete acts. Ms. Vay contends she experienced many instances of wrongful suspension, wrongful discipline, and false accusations.  This conduct is individually actionable, and therefore cannot be considered for aggregation purposes under the continuing violation doctrine.  The remaining nondiscrete acts include (a) the physical threat by a coworker in 2010; (b) locker room talk about female employees; (c) derogatory sex-based comments by supervisors and coworkers directed toward Ms. Vay in 2010 and 2011; and (d) a number of instances throughout her employment

where supervisors acted with hostility toward Ms. Vay. One of these acts of hostility—Mr. Baker's outburst at the December 2, 2013 Loudermill hearing, occurred within the limitations period. These nondiscrete acts are more than the occurrence of isolated or sporadic acts of intentional discrimination and are sufficient to establish a persistent, ongoing pattern of actions under the continuing violation doctrine.

### c. Ms. Vay may proceed on Title VII and PHRA gender discrimination claims against the County.[186]

The County contends Ms. Vay suffered no adverse employment action except for her August 2013 26-day suspension, which is not actionable because there are no valid comparators. Ms. Vay counters she suffered three adverse actions: (1) August 2013 26-day unpaid suspension; (2) December 2013 indefinite paid leave; and (3) December 2014 termination.

Under Title VII, Plaintiff is an "unlawful employment practice for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's" sex.[187] For Vay's claim of gender discrimination, we follow the three-step framework in *McDonnell Douglas*[188] and first determine whether she states a prima facie case.[189] Second, we ask whether the County provides a legitimate nondiscriminatory reason for its conduct.[190] Third, we determine whether Ms. Vay can prove the County's proffered reason is pretextual.[191]

To state a *prima facie* case of gender discrimination, Ms. Vay must show (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) members of the opposite sex were treated more favorably or the circumstances otherwise give rise to an inference of intentional discrimination.[192]

The County does not argue Ms. Vay fails to demonstrate pretext. Instead, the County argues the December 2013 indefinite paid leave and December 2014 termination are not valid

adverse employment actions.  As to Ms. Vay's termination, the County's sole argument is Ms. Vay failed to exhaust administrative remedies as to this claim—an argument we reject above.

As to the County's placement of Ms. Vay on indefinite paid administrative leave, we agree placement on paid administrative leave pending an investigation of misconduct, without more, does not constitute an adverse employment action.[193]  An adverse employment action is a "serious and tangible" alteration of the "terms, conditions, or privileges or employment."[194]  In *Jones v. SEPTA*, our Court of Appeals held a "paid suspension pending an investigation of an employee's alleged wrongdoing does not" constitute an adverse employment action.[195]  The employer suspended the plaintiff with pay upon discovering apparent fraud in her time sheets.[196]  Under these circumstances, the plaintiff's paid suspension did not alter the terms, conditions, or privileges of her employment "because 'the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances.'"[197]

Consistent with *Jones*, the Court of Appeals for the Second, Fourth, Fifth, Sixth, and Eighth Circuits held placement on paid administrative leave *pending an investigation into misconduct* does not constitute an adverse employment action.[198]  The Court of Appeals for the Second Circuit explained, "[t]hese circuits have reasoned that the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances."[199]  "The relevant question is therefore whether the employer has simply applied reasonable disciplinary procedures to an employee or if the employer has exceeded those procedures and thereby changed the terms and conditions of employment.  Paid suspension during an investigation could thus potentially be adverse if the employer takes actions beyond an employee's normal exposure to disciplinary policies."[200]

A genuine issue of material fact exists as to whether the County's placement of Ms. Vay on indefinite paid administrative leave without providing her a reason constitutes an adverse employment action. Under normal employment circumstances, working on the job is an ordinary term of employment. An employer's decision to place an employee on a paid suspension without any allegation of wrongdoing is not an ordinary term or condition of employment. The County does not contend it "simply applied reasonable disciplinary procedures,"[201] but instead contends it placed Ms. Vay on paid leave due to the district attorney's office's investigation. This contention is belied by the County's subsequent decision to offer Ms. Vay a position as an investigator in the public defender's office. The County itself did not conduct its own investigation. There is a genuine issue of material fact as to whether the County applied reasonable disciplinary procedures when placing Ms. Vay on indefinite paid administrative leave.

As to Ms. Vay's August 2013 26-day suspension, the County argues Ms. Vay fails to satisfy her *prima facie* burden of showing the County treated a similarly situated comparator more favorably than Ms. Vay. In determining whether male employees are similarly situated, we "focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action."[202] We also must focus on whether the alleged comparator is employed in a comparable position, as "an employee who holds a different job in a different department is not similarly situated."[203] In the context of employer discipline, we also consider whether the alleged comparator "engaged in similar offending conduct."[204]

The County suspended Ms. Vay for 26 days for disorderly conduct and destroying County property relating to an August 9, 2013 meeting with Director Baker. Mr. Manno, also an investigator in the Medical Examiner's Office, allegedly engaged in similar conduct but the

County did not discipline him. Ms. Bogoevski stated she saw Mr. Manno "yell, throw things, scream, cuss, slam down phones" in the presence of a supervisor, and the supervisor dismissed the conduct, stating, "It's okay, he does this every day. You'll get used to it."[205] Mr. Manno swore at management on almost a daily basis, called Director Huston a "f**king moron" to another supervisor, and "said 'f**k off' all of the time to management."[206] Mr. Manno also admits he poked a hole in a GPS unit—which supervisors knew he did. The County did not discipline Mr. Manno for this conduct. Although Mr. Manno and Ms. Vay's conduct occurred at different times, this evidence creates a genuine dispute of material fact as to whether the County treated a similarly situated male employee more favorably than Ms. Vay.

### d. Ms. Vay may proceed on a §1983 gender discrimination claim against the Individual Defendants.

The Individual Defendants' arguments with respect to Ms. Vay's § 1983 gender discrimination claims are the same as the County's arguments as to Ms. Vay's Title VII gender discrimination claim. Because we review Ms. Vay's § 1983 gender discrimination claims under the same standard as her Title VII gender discrimination claim,[207] we reject the Individual Defendants' arguments for the same reasons we rejected the County's arguments.

We do not consider the Individual Defendants' new arguments raised in their reply. In their reply, the Individual Defendants raise—for the first time—arguments regarding their lack of personal involvement in the adverse employment actions. Because the Individual Defendants failed to raise these arguments in their response, we will not consider these new arguments raised for the first time in their reply.[208]

**e. Ms. Vay may proceed on hostile work environment claims under § 1983, Title VII, and the PHRA against the County and Individual Defendants.[209]**

The County and Individual Defendants argue Ms. Vay fails to satisfy the elements of a hostile work environment claim. Although our Court of Appeals has not addressed whether a plaintiff can pursue a hostile work environment claim under § 1983, the general consensus among federal courts is to permit these § 1983 claims.[210] The elements of a hostile work environment claim under Title VII and § 1983 are the same.[211] To succeed on her hostile work environment claim, Ms. Vay must establish: (1) she suffered intentional discrimination because of her sex; (2) she suffered severe or pervasive discrimination; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person in similar circumstances; and (5) the existence of respondeat superior liability.[212] For summary judgment purposes, the County and Individual Defendants contest all of these elements except for the third element of detrimentally affecting Ms. Vay.

*Intentional discrimination*

The County and Individual Defendants' argue Ms. Vay cannot demonstrate intent to discriminate because Mr. Manno is not a valid comparator with respect to Ms. Vay's August 2013 26-day suspension. As we held Mr. Manno is a valid comparator, and a reasonable jury could infer intent to discriminate on the basis of gender based on the County's failure to discipline Mr. Manno, we reject this argument. This finding is also supported by Manager Pilarski's statements calling Ms. Vay a bitch.

*Severe or pervasive*

To determine whether an environment is severe or pervasive, we must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance."[213]  "[T]he 'conduct must be extreme to amount to a change in the terms and conditions of employment.'"[214]  This analysis "must concentrate not on individual incidents, but on the overall scenario."[215]  "[T]he advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim."[216]

For example, in *Jenson v. Potter*, our Court of Appeals held a jury could find severe or pervasive retaliatory harassment where there were retaliatory insults two to three times per week for 19 months, physical threats, and at least four instances of property damage to the employee's vehicle.[217] The severity of the threats and property damage combined with the frequency of the insults raised "a material question of fact as to whether retaliatory harassment 'permeated' the workplace and changed the terms or conditions of the employee's employment."[218]

Evidence employees falsely accused Ms. Vay of wrongdoing may also be considered in determining whether harassment is severe or pervasive.[219]  In *Aman v. Cort Furniture Rental Corporation*, our Court of Appeals found relevant employees' false accusations of favoritism to other black employees and dereliction of duty.[220]

Although "the pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment,"[221] "[o]ccasional insults, teasing, or episodic instances of ridicule are not enough; they do not 'permeate' the workplace and change the very nature of the plaintiff's employment."[222]

In *Webb v. Merck*, Judge Yohn held the employee proffered sufficient evidence for a jury to find he suffered severe or pervasive racial harassment over a period of one year while working

at Merck.[223]  The employee learned through other employees his supervisor referred to himself as the "zookeeper" and his all African-American shift crew as his "animals."[224]  The supervisor administered disparate and harsh discipline to the employee in comparison to white coworkers.[225]  When the employee complained to management about his supervisor's behavior, management failed to address his complaints.[226]  Instead, his supervisor increased scrutiny after the employee complained of discriminatory treatment, and the supervisor falsely accused the employee of committing a work error, resulting in a five-day suspension.[227]  The employer did not conduct a fair and impartial investigation, as they failed to interview key witnesses and ignored multiple witnesses who corroborated the employee's version.[228]

A reasonable jury could conclude Ms. Vay similarly endured severe or pervasive harassment.  Early on in her employment, Ms. Vay's coworkers made sexually derogatory references toward her, including "bitch," "whore," and "c**t crew."  Management called Ms. Vay a bitch on at least three occasions and on separate occasions suggested she acted like a c**t and dressed like a whore.  On one occasion, a coworker physically threatened Ms. Vay, calling her a bitch.  Management responded to Ms. Vay's complaints of unfair treatment or derogatory statements with hostility or by ignoring them.  Management threatened to fire Ms. Vay on multiple occasions and made clear they would do whatever they could to ensure Ms. Vay would "not step foot in [the Medical Examiner's Office] again."[229]  Considering the totality of the circumstances, a reasonable jury could conclude Ms. Vay endured severe or pervasive harassment.

### Detrimental effect on a reasonable person

The County and Individual Defendants argue no reasonable employee who committed the acts leading to Ms. Vay's discipline would reasonably expect to not be disciplined.    In

determining whether the objective test is met, we look at all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[230] "Title VII is not violated by the 'mere utterance of an . . . epithet which engenders offensive feelings in an employee' or by mere 'discourtesy or rudeness,' unless so severe or pervasive as to constitute an objective change in the conditions of employment."[231] For the reasons stated with respect to the "severe or pervasive" requirement, we conclude a jury could find a reasonable person in Ms. Vay's position would find the conduct alleged to be harmful enough to alter her working conditions.

### *Respondeat superior liability*

The County argues Ms. Vay's harassment did not result in a tangible employment action, meaning the County may rely on the affirmative defense it exercised reasonable care to prevent and promptly correct harassment. "If supervisors create the hostile environment, the employer is strictly liable, though an affirmative defense may be available where there is no tangible employment action."[232] In such cases, an employer may defeat vicarious liability by showing "'the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior,' and that 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'"[233] The County may not rely on this affirmative defense because it, and not a subordinate, fired Ms. Vay.

### f.   Ms. Vay may proceed on Title VII and PHRA retaliation claims.

To state a *prima facie* case of retaliation under Title VII, Ms. Vay must establish (1) she engaged in protected activity; (2) the employer engaged in conduct constituting an adverse action

either contemporaneous with or after the protected activity; and (3) a causal connection between the protected activity and the adverse action.[234]  If she does so, then the County must advance a legitimate, nondiscriminatory reason for its adverse action.[235]  Then, Ms. Vay must produce some evidence demonstrating pretext—"both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."[236]

The County contends Ms. Vay cannot satisfy any of the elements of a *prima facie* case or demonstrate pretext.

### Protected activity

Ms. Vay contends she engaged in protected activity in July 2011 when she complained to human resources about derogatory comments, including the "whore" and "c**t crew" comments. Title VII protects those who oppose unlawful discrimination.[237] For a statement to constitute protected activity, "it must be possible to discern from the context of the statement that the employee opposes an unlawful employment practice."[238]  Ms. Vay must have an objectively reasonable belief the activity she opposed constituted unlawful discrimination.[239]  For example, in *Greene v. MPW*, Chief Judge Ambrose held the plaintiff reasonably believed he opposed a racially hostile work environment when he complained a coworker's use of the word "nigger."[240] We similarly conclude Ms. Vay reasonably believed she opposed a hostile work environment when complaining about her coworkers' "whore" and "c**t crew" comments, which were directed at her.

### Adverse actions

Ms. Vay contends the County took discrete adverse actions against her: (1) her August 2013 26-day suspension; (2) her December 2013 indefinite paid suspension; and (3) her December 2014 termination.  Ms. Vay also contends the hostile work environment she suffered

constitutes a materially adverse action. Under Title VII's anti-retaliation provision, Ms. Vay must show the County engaged in conduct which a reasonable employee would have viewed as materially adverse because the County's conduct "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[241]

Under this standard, Ms. Vay's suspensions and termination are materially adverse actions. The County terminated her before a hearing and, when she succeeded, continued to threaten actions to ensure termination.

### Causal connection

Ms. Vay contends the causal connection requirement is satisfied based on the hostile work environment she experienced following her complaint. To establish a causal connection, "a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."[242] In the absence of such proof, Ms. Vay "must show that from the 'evidence gleaned from the record as a whole' the trier of the fact should infer causation."[243]

A reasonable jury could infer a causal connection based on the record as a whole. In September 2011, two months after Ms. Vay's complaint, Manager Pilarski reacted with hostility toward Ms. Vay after she requested a union representative at her meeting. In the years proceeding Ms. Vay's complaint, Management suspended her for conduct for which other employees not associated with her were not disciplined. Management also falsely accused her of misconduct, and created an environment Ms. Sullivan described as "stressful all of the time" and "hateful."[244] A reasonable jury could find a causal connection under these circumstances.

### g. Ms. Vay does not oppose dismissal of her § 1983 retaliation claims.

The Individual Defendants argue Ms. Vay's § 1983 claims are not actionable. Ms. Vay does not oppose dismissal of her § 1983 retaliation claims.

### III.     Conclusion

Ms. Vay established a *prima facie* case of gender discrimination, hostile work environment, and retaliation under Title VII, § 1983, and the PHRA against the County and the Individual Defendants. The motion for summary judgment is granted with respect to Ms. Vay's § 1983 retaliation claims. In the accompanying Order, we deny the motion in all other respects because Ms. Vay established gender discrimination, hostile work environment, and retaliation subject to the jury's evaluation of the disputed facts.

---

[1] We amend only to correct an inadvertent typographical error on Page 18. Nothing in this Amended Memorandum affects our reasoning in support of our December 16, 2016 Order (ECF Doc. No. 277).

[2] We consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to" Ms. Vay, "the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted).

[3] ECF Doc. No. 262, ¶ 1.

[4] *Id.* ¶ 2.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] ECF Doc. No. 265-1, ¶ 5.

[9] *Id.*

[10] ECF Doc. No. 265-15, ¶ 6.

[11] *Id.*

[12] *Id.* ¶ 25.

[13] ECF Doc. No. 265-16, ¶ 11.

[14] ECF Doc. No. 265-11, at p. 20.

[15] ECF Doc. No. 265-2, at pp. 34–35.

[16] ECF Doc. No. 265-2, at pp. 14–15.

[17] ECF Doc. No. 265-10, at p. 19.

[18] ECF Doc. No. 265-10, at p. 22.

[19] ECF Doc. No. 265-1, ¶ 11.

[20] *Id.*

[21] *Id.*

[22] ECF Doc. No. 248-19; ECF Doc. No. 265-2, at p. 40.

[23] ECF Doc. No. 265-2, at p. 40; ECF Doc. No. 265-6, at p. 15.

[24] ECF Doc. No. 265-1, ¶ 13.

[25] *Id.* ¶ 12.

[26] ECF Doc. No. 265-1 ¶ 15; ECF Doc. No. 265-4, at p. 14.

[27] ECF Doc. No. 265-2, p. 45.

[28] ECF Doc. No. 265-13, at p. 5.

[29] *Id.* at pp. 5, 29.

[30] ECF Doc. No. 265-2, at p. 103; ECF Doc. No. 265-13, at p. 11.

[31] ECF Doc. No. 265-2, at p. 51.

[32] *Id.* at p. 103.

[33] ECF Doc. No. 265-3, at pp. 12–13.

[34] ECF Doc. No. 265-1, ¶ 18.

[35] ECF Doc. No. 265-10, at pp. 47–58.

[36] ECF Doc. No. 265-1, ¶ 34.

[37] ECF Doc. No. 265-1, ¶ 34.

[38] ECF Doc. No. 265-10, at pp. 50–51.

[39] ECF Doc. No. 265-1, ¶¶ 20–21.

[40] *Id.* ¶ 22.

[41] ECF Doc. No. 265-7, at pp. 30–33, 35.

[42] ECF Doc. No. 265-2, at p. 82; ECF Doc. No. 265-13, at p. 21.

[43] ECF Doc. No. 265-1, ¶ 24.

[44] *Id.* ¶ 25.

[45] *Id.* ¶ 26.

[46] ECF Doc. No. 265-6, at pp. 13–14.

[47] ECF Doc. No. 265-8, at pp. 51–52.

[48] ECF Doc. No. 265-2, at pp. 78–79.

[49] ECF Doc. No. 265-1, ¶ 28; ECF Doc. No. 265-2, at p. 76.

[50] ECF Doc. No. 265-13, at pp. 113–118.

[51] *Id.* at p. 116.

[52] *Id.* at pp. 39, 45.

[53] ECF Doc. No. 265-1, ¶ 30.

[54] *Id.* ¶ 31.

[55] ECF Doc. No. 265-2, at p. 332.

[56] ECF Doc. No. 265-1, ¶ 35.

[57] ECF Doc. No. 265-10, at p. 58.

[58] ECF Doc. No. 265-1, ¶ 36.

[59] *Id.* ¶ 37.

[60] *Id.* ¶ 38.

[61] ECF Doc. No. 265-13, at p. 6; ECF Doc. No. 265-13, at p. 127.

[62] ECF Doc. No. 265-10, at pp. 55–57.

[63] *Id.* at p. 57

[64] ECF Doc. No. 265-1, ¶ 39.

[65] *Id.* ¶ 39.

[66] *Id.* ¶ 40.

[67] *Id.* ¶ 41.

[68] *Id.* ¶ 42.

[69] *Id.* ¶ 42.

[70] *Id.* ¶¶ 43–44.

[71] *Id.* ¶ 44.

[72] *Id.*

[73] *Id.* ¶ 45.

[74] ECF Doc. No. 265-2, at p. 86.

[75] ECF Doc. No. 265-15, ¶ 12.

[76] ECF Doc. No. 265-16, ¶ 4.

[77] ECF Doc. No. 265-2, at p. 86; ECF Doc. No. 265-15, ¶ 10.

[78] ECF Doc. No. 265-13, at p. 16.

[79] *Id.*

[80] ECF Doc. No. 265-7, at pp. 15–16.

[81] ECF Doc. No. 265-1, ¶ 46.

[82] *Id.* ¶¶ 47–48.

[83] ECF Doc. No. 265-1, ¶ 49.

[84] ECF Doc. No. 265-13, at p. 92.

[85] *Id.* at p. 130.

[86] ECF Doc. No. 265-5, at p. 8.

[87] ECF Doc. No. 265-1, ¶ 51.

[88] *Id.* ¶ 50.

[89] ECF Doc. No. 248-22.

[90] *Id.*

[91] ECF Doc. No. 265-17, at p. 34.

[92] *Id.* at pp. 33–34.

[93] ECF Doc. No. 265-2, at pp. 91, 93.

[94] ECF Doc. No. 248-23.

[95] *Id.*

[96] ECF Doc. No. 265-17, at p. 30.

[97] *Id.* at p. 33.

[98] ECF Doc. No. 265-15, ¶ 14.

[99] *Id.*

[100] *Id.* ¶ 15.

[101] ECF Doc. No. 265-13, at p. 106.

[102] *Id.*

[103] *Id.*

[104] ECF Doc. No. 265-13 at p. 55.

[105] ECF Doc. No. 265-1, ¶ 53.

[106] *Id.*

[107] *Id.* ¶ 54.

[108] *Id.* ¶ 55.

[109] *Id.* ¶ 56.

[110] ECF Doc. No. 248-24, at p. 1.

[111] *Id.*

[112] ECF Doc. No. 151-5, at p. 4.

[113] *Id.* at p. 1.

[114] ECF Doc. No. 265-15, ¶¶ 22–23.

[115] ECF Doc. No. 265-17, at p. 13.

[116] *Id.* at pp. 19–21.

[117] *Id.* at p. 21.

[118] *Id.* at pp. 21–22.

[119] ECF Doc. No. 265-1, ¶ 58.

[120] ECF Doc. No. 248-43, at p. 1.

[121] ECF Doc. No. 265-1, ¶ 59.

[122] ECF Doc. No. 265-13, at p. 48.

[123] *Id.* at p. 50.

[124] *Id.* at p. 49.

[125] ECF Doc. No. 265-1, ¶ 60.

[126] ECF Doc. No. 265-17, at p. 44.

[127] ECF Doc. No. 265-1, ¶ 60.

[128] *Id.* ¶ 61.

[129] *Id.* ¶¶ 61–62

[130] *Id.* ¶ 63.

[131] ECF Doc. No. 265-16, ¶ 8.

[132] *Id.*

[133] ECF Doc. No. 265-13, at p. 53.

[134] *Id.*

[135] ECF Doc. No. 265-1, ¶ 80.

[136] ECF Doc. No. 265-13, at p. 54.

[137] *Id.*

[138] ECF Doc. No. 265-1, ¶ 81; ECF Doc. No. 248-13, at p. 3.

[139] ECF Doc. No. 248-39, at p. 5.

[140] ECF Doc. No. 265-1, ¶ 81.

[141] ECF Doc. No. 248-13, at p. 3.

[142] ECF Doc. No. 265-1, ¶ 82.

[143] ECF Doc. No. 265-13, at pp. 86–87.

[144] ECF Doc. No. 265-1, ¶ 82.

[145] *Id.* ¶ 83.

[146] ECF Doc. No. 262, ¶ 1a.

[147] 42 U.S.C. § 2000e *et seq.*

[148] 43 Pa. C.S.A. § 951 *et seq.*

[149] Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. US. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

[150] ECF Doc. No. 252, at p. 11 n.7.

[151] ECF Doc. No. 263, at p. 2–3.

[152] *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 163 (3d Cir. 2013) (quoting *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398–99 (3d Cir. 1976)) (brackets omitted).

[153] *Id.* (quoting *Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir. 1996)).

[154] *See Waiters v. Parsons*, 729 F.2d 233, 238 (3d Cir. 1984).

[155] *Id.*

[156] *Id.*

[157] *Id.*

[158] *Id.*

[159] *Kerns v. Drexel Univ.*, No. 06-5575, 2008 WL 2876590, at *8 (E.D. Pa. July 24, 2008).

[160] *Id.*

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] *Id.*

[165] ECF Doc. No. 248-29, at p. 4.

[166] *Id.*

[167] *Id.* (emphasis omitted).

[168] *Id.*

[169] *Mandel*, 706 F.3d at 163.

[170] *Id.* at 165 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)) (brackets omitted).

[171] *Id.* (quoting *Nat'l R.R. Passenger Corp.*, 536 U.S. at 114).

[172] *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006).

[173] *Id.*

[174] ECF Doc. No. 263, at p. 2–3.

[175] *Mandel*, 706 F.3d at 164 (quoting 43 Pa. Stat. § 959(h)).

[176] *Id.* at 165 (quoting 42 U.S.C. § 2000e–5(e)(1)).

[177] *Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 602 (3d Cir. 2015) (quoting *Kach v. Hose*, 589 F.3d 626, 639 (3d Cir. 2009)) (brackets omitted).

[178] Pa. Cons. Stat. § 5524(7).

[179] ECF Doc. No. 1.

[180] *Mandel*, 706 F.3d at 165.

[181] *Id.* (quoting *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006)).

[182] *W. v. Philadelphia Elec. Co.*, 45 F.3d 744, 754–55 (3d Cir. 1995) (quoting *Jewett v. Int'l Tel. & Tel. Corp.*, 653 F.2d 89, 91 (3d Cir. 1981)).

[183] *Mandel*, 706 F.3d at 166.

[184] *Id.* at 166 n.2.

[185] *O'Connor*, 440 F.3d at 127.

[186] "[T]he PHRA is to be interpreted as identical to federal antidiscrimination laws except where there is something specifically different in its language requiring that it be treated differently." *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 327 (3d Cir. 2015) (quoting *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002)). Vay does not point to specific language requiring different treatment.

[187] 42 U.S.C. § 2000e–2(a)(1).

[188] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[189] *Jones*, 796 F.3d at 326.

[190] *Id.*

[191] *Id.*

[192] *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).

[193] *Jones*, 796 F.3d at 327.

[194] *Id.* at 326 (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)).

[195] *Id.* at 326.

[196] *Id.* at 324.

[197] *Id.* at 326.

[198] *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000); *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001); *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004); *Singletary v. Missouri Dep't of Corr.*, 423 F.3d 886, 891–92 (8th Cir. 2005). *Joseph v. Leavitt*, 465 F.3d 87, 92 (2d Cir. 2006).

[199] *Joseph*, 465 F.3d at 91.

[200] *Id.* at 93 n.1.

[201] *Id.*

[202] *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 359 (3d Cir. 1999) (quoting *Simpson v. Kay Jewelers*, 142 F.3d 639, 646 (3d Cir. 1998)).

[203] *Mandel*, 706 F.3d at 170 (citing *Pivirotto*, 191 F.3d at 358–59).

[204] *Epps v. First Energy Nuclear Operating Co.*, No. 11-1462, 2013 WL 1216858, at *18 (W.D. Pa. Mar. 25, 2013) (quoting *Mandel*, 706 F.3d at 170).

[205] ECF Doc. No. 265-17, at p. 13.

[206] ECF Doc. No. 265-16, ¶ 4.

[207] *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 432 (3d Cir. 1997).

[208] *Konold v. Superior Int'l Indus. Inc.*, 911 F. Supp. 2d 303, 307 n.2 (W.D. Pa. 2012) (citing *Alston v. Forsyth*, 379 F. App'x 126, 129 (3d Cir. 2010)).

[209] Again, we do not consider the Individual Defendants' new arguments raised for the first time in their reply brief regarding their lack of individual involvement. *Konold*, 911 F. Supp. 2d at 307 n.2 (citing *Alston*, 379 F. App'x at 129). The Individual Defendants may raise these arguments following the close of the Ms. Vay's case or all the evidence.

[210] *Pollock v. City of Philadelphia*, No. 06-4089, 2008 WL 3457043, at *9 (E.D. Pa. Aug. 8, 2008).

[211] *Id.*

[212] *Mandel*, 706 F.3d at 167 (3d Cir. 2013) (citing *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006)).

[213] *Id.* at 168 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

[214] *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

[215] *Mandel*, 706 F.3d at 168 (quoting *Caver v. City of Trenton,* 420 F.3d 243, 262–63 (3d Cir. 2005)).

[216] *Cardenas v. Massey*, 269 F.3d 251, 261–62 (3d Cir. 2001).

[217] *Jensen*, 435 F.3d at 452.

[218] *Id.* (*Harris*, 510 U.S. at 21) (brackets omitted).

[219] *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996).

[220] *Id.* at 1078.

[221] *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir. 1990).

[222] *Jensen*, 435 F.3d at 451.

[223] *Webb v. Merck & Co.*, 450 F. Supp. 2d 582, 598 (E.D. Pa. 2006).

[224] *Id.*

[225] *Id.* at 596.

[226] *Id.*

[227] *Id.*

[228] *Id.* at 591–92.

[229] ECF Doc. No. 248-29, at p. 4 (emphasis omitted).

[230] *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 280 (3d Cir. 2001) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

[231] *Id.* (quoting *Faragher*, 524 U.S. at 787).

[232] *Jensen*, 435 F.3d at 452 (quoting *Burlington*, 524 U.S. at 765).

[233] *Pennsylvania State Police v. Suders*, 542 U.S. 129, 145–46 (2004) (quoting *Burlington*, 524 U.S. at 765).

[234] *Jones*, 796 F.3d at 329 (quoting *E.E.O.C. v. Allstate Ins. Co.*, 778 F.3d 444, 449 (3d Cir. 2015)).

[235] *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006).

[236] *Id.* (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997)).

[237] *Id.* at 341.

[238] *Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc.*, 450 F.3d 130, 135 (3d Cir. 2006) (citing *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1012–13 (9th Cir. 1983)).

[239] *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 194 (3d Cir. 2015).

[240] *Greene v. MPW Indus. Servs., Inc.*, No. 06-647, 2006 WL 3308577, at *3 (W.D. Pa. Oct. 4, 2006).

[241] *Moore*, 461 F.3d at 341 (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68).

[242] *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

[243] *Id.*

[244] ECF Doc. No. 265-10, at p. 58.