```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
_____

KELLY J. VAY,
                         Plaintiff,
                                              Civil Action
          vs                                  No. 14-769

ROBERT HUSTON, et al.,
                         Defendants.

_____


          Transcript of Day 1 of Jury Trial proceedings held on
Monday, January 30, 2017, United States District Court,
Pittsburgh, Pennsylvania, before the Honorable Mark A. Kearney,
U.S. District Court Judge.


APPEARANCES:

For the Plaintiff:          Michael J. Lorence, Esq.
                            LorenceLaw@iCloud.com

                            James B. Lieber, Esq.
                            jlieber@lhhb-law.com

                            Thomas M. Huber, Esq.
                            thuber@lhhb-law.com

For the Defendant:          Virginia Spencer Scott, Esq.
                            virginia.scott@alleghenycounty.us

                            Frances M. Liebenguth, Esq.
                            frances.liebenguth@alleghenycounty.us



Court Reporter:             Shirley Ann Hall, FAPR, RDR, CRR
                            6260 U.S. Courthouse
                            Pittsburgh, PA 15219
                            shirleyhall_uscra@yahoo.com


Proceedings recorded by digital stenography; transcript
produced by computer-aided transcription.
```

1                        P R O C E E D I N G S

2          (In open court with counsel and parties present.)

3                  THE COURT:  Please be seated.

4                  MS. SCOTT:  Good morning, Your Honor.

5                  THE COURT:  Good morning.

6              Good morning, madam reporter.

7                  MRS. HALL, COURT REPORTER:  Good morning.

8                  THE COURT:  Counsel wanted to raise an issue with me

9    before we pick a jury?  I also have to raise an issue.  I guess

10   I need to have some information from counsel as well.  So we'll

11   have the jury up in about ten minutes, it's a good opportunity.

12   First let me get the entries of appearance for Ms. Vay.

13                  MR. LIEBER:  James Lieber for Ms. Vay.

14                  MR. HUBER:  Tom Huber for Ms. Vay.

15                  MR. LORENCE:  Michael Lorence for Ms. Vay.

16                  THE COURT:  Good morning.

17              And for the County.?

18                  MS. SCOTT:  Good morning, Your Honor.

19                  THE COURT:  Good morning.

20                  MS. SCOTT:  Virginia Scott for all of the Defendants

21   in this case.

22                  THE COURT:  Okay.  Good morning.

23                  MS. SCOTT:  And also with me Frances Liebenguth for

24   all Defendants.

25                  THE COURT:  Good morning.  Welcome.  I spoke with you

10:36:45AM 1   over the phone; nice to see you.

2       Okay.  So first things first.  You have a list of —

3   the madam deputy has given you a list of the 30 random persons

4   for the voir dire.  And just by way of cutting short some of

5   the problem, No. 15 e-mailed late last night and said that she

6   has no one to watch her two-year-old.  Now, of course had we

7   known that before nine o'clock last night, we would have

8   excused her.  So No. 15 is to be excused, so strike No. 15.

9   She'll come into the room, but she won't be — she's automatic,

10   she'll be my strike.  She would have been — her name is No. 15

11   on your list of witnesses — list of jurors.

12       Okay.  Second question is under my policies I just

13   need to know where these people are from, and I have some

14   additional names that came into the Plaintiff's identification

15   of witnesses — or potential parties, so where is Mr. — is it

16   Houston or Huston?

17       MS. SCOTT:  It's Huston.

18       THE COURT:  Where is Mr. Huston from?

19       MS. SCOTT:  Pittsburgh.

20       THE COURT:  And where is Ms. Vay from?

21    (Off the record discussion)

22       MS. SCOTT:  Fredericktown, PA.

23       THE COURT:  Hold on one minute.  Where is Ms. Vay

24   from?

25       MS. VAY, PLAINTIFF:  Westmoreland County.

10:38:03AM 1          THE COURT:  Okay.  Thank you.  I'll go through all

2      those so the jury knows.

3                THE COURT:  Mr. Huston is from where?  I'm sorry.

4                MS. SCOTT:  Fredericktown, Pennsylvania.

5                THE COURT:  Which County is that?

6                MS. SCOTT:  Washington.

7                THE COURT:  Fredericktown, okay.  Mr. Baker?

8                MS. SCOTT:  Indiana County.

9                THE COURT:  Okay.

10               MS. SCOTT:  Indiana, Pennsylvania, in Indiana County.

11               THE COURT:  Okay, thank you.  Mr. Pilarski.

12               MS. SCOTT:  He's from Pittsburgh.

13               THE COURT:  Okay.

14               MS. SCOTT:  Allegheny County.

15               THE COURT:  Mr. -- is it Chichwak?

16               MS. SCOTT:  Chichwak.

17               THE COURT:  Chichwak.

18               MS. SCOTT:  Yes.  And he's -- he's in Houston, Texas.

19               THE COURT:  Okay.

20               MR. LIEBER:  He was for a long time in Pittsburgh.

21               MS. SCOTT:  He was.

22               THE COURT:  Doesn't matter; where he is today.

23               MR. LIEBER:  Thank you, Your Honor.

24               THE COURT:  I know Bogoevski is from Michigan.  Curtis

25     Williams?  I'm sorry, Plaintiff.

10:39:01AM 1          MR. LORENCE:  He's from Pittsburgh, Judge.

2          THE COURT:  All right, stay with me.  I have about  40

3     names on here so stay with me.  Fred Manno?

4          MR. LORENCE:  He's from Pittsburgh.

5          THE COURT:  All right.  Thank you.

6          MR. LORENCE:  You're welcome.

7          THE COURT:  Richard Lorah?

8          MR. LORENCE:  He's a defense --

9          THE COURT:  Okay.

10          MS. SCOTT:  He's from Allegheny County.  I would say

11     greater Pittsburgh; I'm not sure specifically.

12          THE COURT:  Okay.  Mr. Vay, Keith Vay.

13          MR. LORENCE:  Mr. Vay is also from

14     Westmoreland County.

15          THE COURT:  Okay.

16          MR. LORENCE:  And just to clarify, Mr. Lorah, Judge,

17     is a current employee of the defense, but we're not calling him

18     in our case-in-chief.  My understanding is they're calling him.

19          THE COURT:  Doesn't matter.

20          MR. LORENCE:  Okay, you're right.  Okay.

21          THE COURT:  This is voir dire.  I need to have -- if

22     somebody is Mr. Lorah's brother-in-law, you would want to know

23     that I think, right?

24          MR. LORENCE:  Yes, yes.

25          THE COURT:  I would think you would.  Okay.  This is

10:39:48AM 1    the gray one, John Smith.  Okay?  So how -- so where is

2    Mr. John Smith from?

3              MS. SCOTT:  He's from greater Pittsburgh,   Allegheny

4    County.

5              THE COURT:  Okay.  And what generally is his job?

6              MS. SCOTT:  He's a supervisor.

7              THE COURT:  He works for the County?

8              MS. SCOTT:  He does.  He's a supervisor in the Medical

9    Examiner's Office.

10             THE COURT:  Just need to know if he works for the

11   County, that's all.

12             MS. SCOTT:  All right.

13             THE COURT:  Okay, Mr. -- the superintendent, Moffatt?

14             MS. SCOTT:  Superintendent Moffatt, he is in

15   Pittsburgh.  He's -- he lives in Pittsburgh, actually.

16             THE COURT:  Is he still the police superintendent?

17             MS. SCOTT:  No, he is retired.

18             THE COURT:  Okay.  Is -- educate an Eagles fan.  Does

19   that mean he's -- is he the chief police officer in the

20   Allegheny County or is there a commissioner?

21             MS. SCOTT:  No.  He -- the superintendent --

22             THE COURT:  No, it's an or question, I'm sorry.  Which

23   is it?

24             MS. SCOTT:  He was the Superintendent of the Police,

25   which is the highest position in the Police Department.

10:40:46AM 1            THE COURT:  Okay.  So the superintendent is the

2   highest position.

3            MS. SCOTT:  Yes.

4            THE COURT:  Okay, all right.  Mr. Longo,

5   Leonard Longo.

6            MS. SCOTT:  He's from greater Pittsburgh,

7   Allegheny County, current employee.

8            THE COURT:  Okay.  Nichole Nagle?

9            MS. SCOTT:  Greater Pittsburgh.

10            THE COURT:  Okay.

11            MS. SCOTT:  Current employee.

12            THE COURT:  Okay.  Darlene Craig?

13            MS. SCOTT:  We are not going to be calling her, she's

14   on FMLD.

15            THE COURT:  Okay, but is she on documents somewhere?

16   Plaintiff identified her as a person on a document or

17   something.

18            MS. SCOTT:  She will appear in some documents.

19            THE COURT:  Well, that's a concern, right?  So where

20   is she from?

21            MS. SCOTT:  Allegheny County -- Pittsburgh,  Allegheny

22   County.

23            THE COURT:  All right, okay.  Dave Smith.

24            MS. SCOTT:  We're not calling him.

25            THE COURT:  Is he on documents?

10:41:34AM 1        MR. LORENCE:  His name pops up in a few, but we're not

2  planning on calling him.

3        THE COURT:  Okay.  That's not really — I appreciate

4  that.  You know my understanding.  If somebody reads an exhibit

5  and says:  Oh, my gosh.  That's my brother — where is he from?

6        MS. SCOTT:  I don't know.

7        MR. LORENCE:  Well, I did serve him a subpoena for a

8  deposition, and I believe it was served in Washington County.

9        THE COURT:  Okay.

10       MR. LORENCE:  I forget the town.

11       THE COURT:  All right, that's okay.  Washington

12  County, that's all I need to know.

13       MR. LORENCE:  And he was a previous — he had a

14  previous working relationship with the County.  I don't know if

15  he was a contractor or employee.  I think he was a employee.

16       THE COURT:  Dr. Karl Williams is a medical examiner,

17  but from where?

18       MS. SCOTT:  He is the Medical Examiner.

19       THE COURT:  So he's from Pittsburgh.

20       MS. SCOTT:  Yes, he — he's the head of the office.

21       THE COURT:  Marty Coyne?

22       MS. SCOTT:  He is from greater Pittsburgh, unless

23  someone knows specifically — Allegheny County.

24       THE COURT:  Okay.  Stephanie Bollard.

25       MS. SCOTT:  Are you comfortable with us just saying

10:42:30AM 1    Allegheny County if we're not sure of the specific --

2               THE COURT:  Yes.

3               MS. SCOTT:  Allegheny County, current employee.

4               THE COURT:  Desmond Brentley?

5               MS. SCOTT:  He's Allegheny County as well.

6               THE COURT:  Okay.  Suzanne Danahauer?

7               MS. SCOTT:  She's Allegheny County.

8               THE COURT:  Okay.  Jerry Hollihan.

9               MS. SCOTT:  Allegheny County.

10              THE COURT:  Edward -- we say it differently from where

11    I'm from -- Carnegie.

12              MS. SCOTT:  We say Carnegie; he's from      Allegheny

13    County.

14              THE COURT:  Okay.  Nicholas Medvid.

15              MS. SCOTT:  Allegheny County.

16              THE COURT:  Alesia Smith.

17              MS. SCOTT:  Allegheny County.

18              THE COURT:  Erin Trainor Moses.

19              MS. SCOTT:  And that's a typo; her name is actually

20    Erin Trainor Medvid.

21              THE COURT:  Okay.  Allegheny County?

22              MS. SCOTT:  Correct.

23              THE COURT:  Lisa Leone?

24              MS. SCOTT:  Allegheny County.

25              THE COURT:  Eve Mert?

10:43:30AM 1         MS. SCOTT:  Allegheny County.

2         THE COURT:  Corey Mert out of Whitaker, PA.  Is that a

3  town?

4         MS. SCOTT:  Yes, that's Whitaker —— I don't think he's

5  listed on any documents and he will not be called.

6         THE COURT:  Corey Mert.

7         MS. SCOTT:  Corey Mert; it's the husband ——

8         MR. LORENCE:  I know who he is.  Yeah, you said you're

9  not calling him.

10         MS. SCOTT:  We are not calling him, and I don't

11  believe he's on a document, so I'm not sure we need his name.

12         THE COURT:  Okay.  Well, he's not on a document, I

13  don't need it.

14         Bob —— Barb Gourley?

15         MS. SCOTT:  Allegheny County.

16         THE COURT:  Lisa Saranoski Earley.

17         MS. SCOTT:  Allegheny County.

18         MR. LORENCE:  Judge, just —— Your Honor, what ——

19  Eve Mirt's husband, his name?

20         THE COURT:  Corey Mert.

21         MS. SCOTT:  Corey Mert.

22         MR. LORENCE:  I believe his name does appear in a

23  document.

24         THE COURT:  I'll keep him in, no big deal.

25         Nelson Earley.

10:44:19AM 1            MS. SCOTT:  Allegheny County.

2            THE COURT:  Okay.  Andy Marburry.

3            MS. SCOTT:  Allegheny County.

4            THE COURT:  Elaine Berringer.

5            MS. SCOTT:  Allegheny County.

6            THE COURT:  Okay.  Don Kanai?

7            MS. SCOTT:  Allegheny County.

8            THE COURT:  Ed McGregor.

9            MS. SCOTT:  Allegheny County.

10           THE COURT:  Jake Lifson, Esquire.

11           MS. SCOTT:  City of Pittsburgh.

12           THE COURT:  Joe Gavnick?

13           MS. SCOTT:  Allegheny County.

14           THE COURT:  Jason Ditzenburger.

15           MS. SCOTT:  Allegheny County.

16           THE COURT:  Okay.  There were a couple that came up on

17  the Plaintiff's proposed voir dire that I did not have on the

18  pretrial, hold on a second — maybe — no, I did have them on,

19  okay.

20           All right, I just need to have — I like to have —

21  they're going to come in the room in about five minutes.

22           MS. SCOTT:  Your Honor, I don't believe that the

23  Plaintiff — I'm not sure that the Court mentioned the name of

24  the doctor that Plaintiff is calling.

25           THE COURT:  Okay.

10:45:15AM 1            MS. SCOTT:  I don't know how you say his name, but I

2      don't recall it being listed by the Court.

3              THE COURT:  Who is the doctor you're calling?

4              MR. LORENCE:  Yes, Judge.

5              THE COURT:  Yes, who?

6              MR. LORENCE:  Yes, we're calling him and Mr. Lieber is

7      handling that.

8              MR. LIEBER:  Safdar Chaudhary.

9              THE COURT:  I saw that name.  Okay.

10             MR. LIEBER:  He's from Westmoreland County.

11             THE COURT:  I have that.  I have Export, Pennsylvania.

12             MR. LIEBER:  Yes.

13             THE COURT:  That's Allegheny County?

14             MR. LORENCE:  Westmoreland County.

15             MR. LIEBER:  Westmoreland.

16             THE COURT:  Westmoreland County, okay.

17             I skipped him because I had Export, Pennsylvania.  I'm

18     sorry.  I skipped people.  For example, Mr. Bofo, I know where

19     he's from; I read his testimony.

20             Okay.  All right.  So you wanted to see me for a

21     minute, Plaintiff did, before we get the jury up here?  Did you

22     want to see me for a minute?

23             MR. LIEBER:  Yes, we have a couple of open things for

24     the Court.

25             THE COURT:  Go ahead.

10:46:05AM  1          MR. LIEBER:  Go ahead —— Mr. Huber is going to talk.

2          THE COURT:  Mr. Huber?

3          MR. HUBER:  Your Honor, we're having ——

4          MR. LORENCE:  Why don't you come sit over here.

5          MR. HUBER:  That's okay.

6      We have a dispute, Your Honor, over a redaction issue.

7  I don't know if your —— the Court recalls, but it had excluded

8  evidence that Plaintiff's daughter is biracial.

9          THE COURT:  Right.

10          MR. HUBER:  And there is an exhibit that is used

11  multiple times in this case, and so we went ahead and blacked

12  out —— there is like two sentences that we blacked out.  And I

13  believe the defense wants it to be less redacted.

14          THE COURT:  Do you a have a copy?

15          MR. HUBER:  Yes, Your Honor.

16      Your Honor, there's the unredacted version followed by

17  Plaintiff's redactions, followed by the Defendant's suggestion.

18          THE COURT:  Thank you.  And this is what exhibit

19  number?

20          MR. HUBER:  Well, it's quite a few exhibits,

21  Your Honor.  I believe it's Exhibit 20 ——

22          MR. LORENCE:  It first appears at 23, which is a

23  July 12th, 2011, e-mail.

24          MR. HUBER:  It's first at 23 and then it is in

25  Plaintiff's Exhibit —— it's also at Exhibit 115 and 116.

10:47:16AM 1          THE COURT:  Is it me but spatially is it three
           2    different places on the same document?
           3          MR. HUBER:  Your Honor, it's a little strange because
           4    every time —— it was forwarded to different people, and that
           5    sort of changed the spacing.
           6          THE COURT:  I got it.  It's in an e—mail chain.
           7          MR. HUBER:  Yes, sir.
           8          THE COURT:  All right.  So we're looking at the
           9    language most likely prompted.  Okay.
          10       (Brief pause in proceedings.)
          11          THE COURT:  Okay.  So County, I'm curious.  You want
          12    this in.  Tell me why you want this in.
          13          MS. SCOTT:  Well —— what do you think —— we weren't
          14    fighting too hard on it.
          15          THE COURT:  Yeah, I wouldn't think you would.
          16          MS. SCOTT:  One of the things that we were trying to
          17    do is that this was investigated and we have documentation to
          18    show that it was investigated.  So that nothing —— and that ——
          19    because one of our witnesses spoke to Supervisor Craig on all
          20    of these issues.
          21          THE COURT:  Okay.
          22          MS. SCOTT:  And she was told a different story.  And
          23    Ms. Vay in that meeting said things that ——
          24          THE COURT:  The point is how are you going to get the
          25    evidence —— we're not going to talk about race of Ms. Vay's

10:49:02AM 1  daughter.  So how is that going to -- how are you going to

2  dance around that with this statement?

3  MS. SCOTT:  Your Honor, we're fine with going with the

4  redaction.

5  THE COURT:  So we'll go with the full redaction on

6  Plaintiff's Exhibit 23.

7  Here you are, sir.

8  MS. SCOTT:  Your Honor, one thing that we'll likely

9  have to do is that we have this document at -- this is -- what

10  Plaintiff has at Exhibit -- what was it, 23?

11  MR. LORENCE:  Twenty-three.

12  MS. SCOTT:  Is that Plaintiff only included part of

13  what this document is.  They didn't include the attachments.

14  THE COURT:  Okay.

15  MS. SCOTT:  So we have this document later in our own

16  group, and so we will make the redaction that Plaintiff has and

17  supplement it at our exhibit.

18  THE COURT:  Okay.  There's no problem with that, but

19  let's be mindful that the jury is only going to see -- if it's

20  the same exhibit, they're only going to see -- remember, we

21  only have one set of exhibits, right?  We have one set of

22  exhibits somewhere?  I was going to ask you are they on a

23  computer somewhere that I'm going to see?  How will I see

24  exhibits?

25  MR. HUBER:  Through a computer, Judge, and we also

10:50:05AM 1    have binders.

2              THE COURT:  Okay.  I mean they're one sequentially —

3    they're not P and D, right?

4              MR. HUBER:  That's correct.

5              THE COURT:  Okay.  So this exhibit that you're talking

6    about that's later on, it just happens to be later on.  It

7    doesn't say D something on it, right?

8              MS. SCOTT:  Well — but we — our exhibits do say D;

9    but when we had talked with the Court, we had already started

10   marking —

11             THE COURT:  We don't refer to them as "P," though.

12             MS. SCOTT:  No, we're going to refer to them as —

13   Exhibit 1.

14             THE COURT:  All right.  Okay, so it's just later on in

15   essence is your point.

16             All right.  Is there anything else?

17             MR. HUBER:  Yes, Your Honor.  One other thing is — it

18   had to do with these labor grievances that came up in the fall

19   of 2013, and we filed a motion in limine on it.  And Defendants

20   have included those as exhibits in the case, and so —

21             THE COURT:  The fact that there was availability of

22   them does not determine it.

23             MR. HUBER:  Exactly, Judge; so we're objecting to the

24   fact that they represent the contents of the grievance and —

25             THE COURT:  I think I just saw that in a motion last

10:50:56AM 1  week, right?

2              MS. SCOTT:  Your Honor, the Court's already ruled on

3  this.  The Court ruled that we were allowed to get into the

4  fact that Ms. Vay did file grievances.

5              THE COURT:  That's right.

6              MS. SCOTT:  But then that the subject matter of the

7  grievances is out.  So what we have done in our –– in the

8  exhibits that are in the joint binder is that the grievances

9  consisted of two pages.  One is the cover sheet that shows who

10  filed it and has just the date and things along that, but it

11  doesn't have the specifics.

12             THE COURT:  Okay.

13             MS. SCOTT:  The second page was the one that actually

14  went into the details.  We have removed that second page ––

15             THE COURT:  Okay.

16             MS. SCOTT:  –– and are just showing the first pages.

17             THE COURT:  Mr. Huber?

18             MR. HUBER:  That sounds fine, Judge.  I didn't know

19  that.

20             THE COURT:  That's not a problem.  Okay.

21             All right, there's also a motion in limine which is

22  rather typical.  I mean I've seen that quite a bit in a sexual

23  harassment case, the pending motion in limine concerning how I

24  address the jury on the purpose of a limiting jury instruction,

25  the hearsay, the purpose of why it's admitted.

10:51:56AM 1          I didn't see an answer to it.  Are you objecting to

2    that?

3          MS. SCOTT:  Your Honor, we are to the extent that the

4    Third Circuit disfavors the idea of commenting only a portion

5    of the evidence.

6          THE COURT:  Yeah, that's right.

7          MS. SCOTT:  So we believe this — highlighting this

8    particular item is inconsistent with what the rules are in

9    total because you're opening the door to commenting — why

10   don't we talk about other parts of testimony?  That Plaintiff

11   is putting in some testimony, but they're not an exhibit in

12   this case, from a witness that is already in the can, is not

13   going to be testifying live, but yet they have hearsay

14   statements, self-serving statements that are in that, and

15   they're seeking to a get that in.

16         So we believe that everything should stay the way it

17   is, that the Court should not give special commentary on only a

18   part of the evidence —

19         THE COURT:  But how do we address the fact that

20   hearsay is coming in because it's offered not for the truth of

21   the matter asserted?  I mean I have to preserve the record so

22   that the Court of Appeals knows that.  So how do you want me to

23   do that?  We can do it before trial — I mean I can make a

24   ruling, but I have to have some ability to preserve the record

25   that the purposes for coming in — which is clearly hearsay —

10:53:10AM 1    is because it's not offered for the truth of the matter

2    asserted.

3            MS. SCOTT:  Understood, Your Honor.

4            THE COURT:  So what do you want me to do?  How would

5    you suggest I carve that out to protect both of your appellate

6    records?

7            MS. SCOTT:  Do you mean in front of the jury?

8            THE COURT:  No, I mean –– I mean –– I have to make a

9    ruling and I say:  Okay, I'm going let it in as hearsay

10   because –– as non-hearsay.

11           MS. SCOTT:  Well, I would suggest we're probably going

12   to get into it with the very first witness and ––

13           THE COURT:  I'm not doing that for the jury's benefit.

14           MS. SCOTT:  I understand.  So if the Court wishes to

15   do it before we actually begin in front of the jury ––

16           THE COURT:  This is late.  We're in front of the jury,

17   and I don't take any side bars –– I think I told you that ––

18   the only objection is something that's crazy that comes from

19   the witness.  We don't do any evidentiary objections during

20   trial unless something comes up that wasn't expected.

21           Tell me exactly what the issue is now.

22           MS. SCOTT:  From our standpoint, we think that the

23   motion in limine should be denied, that we have ––

24           THE COURT:  And the evidence comes in for whatever

25   purpose it comes in, even though it's hearsay by definition and

10:54:14AM 1  that it's not offered for the truth of the matter asserted.

2       MS. SCOTT:  Well, I think that the Court has ruled on

3  the motion in limine and — because they presented a motion in

4  limine to say that the district attorney evidence should not be

5  admitted and the Court ruled on that.

6       THE COURT:  Right, right.

7       MS. SCOTT:  So if the — I'm not sure what the Court's

8  procedures are, but I do agree if you don't believe that the

9  record is preserved, it needs to be preserved that — of what

10  the Court's ruling is as to why the testimony would come in.

11       THE COURT:  Okay.

12       So Mr. Lieber or Mr. Lorence or Mr. Huber, I

13  appreciate from a lawyer to lawyer standpoint why you want me

14  to say that.  Is there any prejudice to you by letting it come

15  in and having you argue from it?

16       MR. LIEBER:  I think there's great prejudice.

17       THE COURT:  Tell me what it is.

18       MR. LIEBER:  Well, first of all, I don't think it's

19  consistent with —

20       THE COURT:  Why would wouldn't you just argue that

21  this is not offered for — say:  Ladies and gentlemen of the

22  jury, this is just showing what the employer's thinking, it's

23  not that it's the truth.  Nobody is saying it's the truth.

24       MR. LIEBER:  Because it's the law and it should come

25  from the Court and the jury need not agree with an advocate.  I

10:55:29AM 1   think the jury –– with material like this, I think the jury ––

2   THE COURT:  The problem is you have a lot of hearsay

3   in this case.  There's a lot of people saying things that are

4   coming in, frankly, for state of mind, not for –– not for the

5   truth.  So how are we going to do that?  I'm not going to do it

6   every witness.

7   I could do a charge that says that if you heard

8   testimony from persons who were not in the courtroom, that were

9   reporting what somebody else told them, you can take it for the

10   fact that it would have on their state of mind, but not for the

11   truth of it.  But I'm not going to limit it to these people

12   because there's a lot of hearsay.

13   All these cases have a lot of hearsay in them.  This

14   is no surprise to you.  Typically we grant it, we say okay; but

15   I don't do it by –– by piecemeal because your point –– the

16   Third Circuit is well-taken, you're highlighting things.  If

17   you start highlighting it, then you're creating some sort of a

18   balance differential.

19   So I'm willing –– all right, I'm going to hold –– I'm

20   going to hold it.  I will give an instruction as to a general

21   instruction without pointing to anybody's particular testimony

22   that if you –– and I'll give you the language on that.  If you

23   heard testimony from persons who talked about what other people

24   told them, you are not to take it for the truth of the matter

25   asserted.  You should consider it solely for the state of mind,

10:56:47AM 1  without pointing to anybody.  Okay?

2               So that will address anybody's question without

3  pointing to any particular witness.

4               MR. LORENCE:  Judge, I think in the motion Mr. Huber

5  also included some proposed language —

6               THE COURT:  All right, I'll take a look at it.

7               MR. LORENCE:  — about, you know, the way lawyers talk

8  about the truth of the matter asserted.  It's kind of an odd

9  expression, you know what I mean?  We want some plain English,

10  so we made a few suggestions.

11               THE COURT:  I'm all about that.

12               MR. LORENCE:  Thank you.

13               THE COURT:  I'll get something to you.

14               Let me tell you what I'm going to say to the jury real

15  quickly so there won't be a problem.  They're coming down.  I

16  introduce the case — I've got to talk about the case.  I don't

17  do most of your voir dire, by the way.  I do voir dire and then

18  we go to side bar for any problems.

19               My deputy gave me the questionnaire from the local

20  rules that I modified, so you'll have those answers when the

21  jury comes in.  The ten questions or so that the local rules

22  require, I modified those.  But we're going — here's what I'm

23  going to say:  Ladies and gentlemen, this is a civil case where

24  a former investigator, Kelly Vay, with the Allegheny County

25  Medical Examiner's Office is seeking damages from a former

10:57:55AM 1    employer, Allegheny County, and four male managers,

2    Robert Huston, Steve Pilarski, Mike Baker and Mike Chichwak,

3    alleging they discriminated against her at work because of her

4    sex, retaliated against her with adverse employment actions

5    because of her complaints about the managers, plural, conduct,

6    and engaged in a severe and/or pervasive pattern of sexual

7    harassment toward her and other women working at the time in

8    the Medical Examiner's Office.

9              Defendants deny discrimination, retaliation and sexual

10    harassment and contend Ms. Vay did not suffer from any

11    discrimination, hostile work environment, or retaliation by the

12    County or by the four male managers.  But instead they argue

13    that Ms. Vay was a volatile employee who they appropriately

14    disciplined and treated appropriately.  Ladies and gentlemen

15    this case is left to you to decide the truth of the facts of

16    this case.

17              That is all that I have to say.

18              MS. SCOTT:  Your Honor ——

19              THE COURT:  First the Plaintiff.

20              MR. LORENCE:  Did you use the word violent a moment

21    ago?

22              THE COURT:  No, I used the word —— discrimination,

23    hostile work environment ——

24              MR. LORENCE:  About Ms. Vay, what they claimed she ——

25              THE COURT:  No, volatile, that's the word they used,

10:58:56AM 1    volatile, not violent.  No, I wouldn't use violent.

2              MR. LORENCE:  I just wanted to make sure.  Thank you,

3       Judge.

4              THE COURT:  That would be a fair case.

5              MS. SCOTT:  Your Honor, we have two points.  One, as I

6       read what the Court said, that it was complaints about

7       managers' conduct --

8              THE COURT:  Right.

9              MS. SCOTT:  -- versus complaints of opposing gender

10      discrimination.  So we would say that it's not about the

11      conduct, but the gender.

12             THE COURT:  The way --

13             MS. SCOTT:  The gender discrimination as opposed to

14      complaints about managers' conduct, because the conduct isn't

15      gender-related if you're just saying how they -- how they -- I

16      would -- I would ask that the Court include gender in that, the

17      complaints about opposing gender discrimination versus simply

18      saying more broadly complaints about how the managers behaved

19      because how the managers behaved is not a Title VII

20      discrimination lawsuit.

21             It has to go to -- that they behaved in a gender

22      discriminatory way or that she was opposing gender

23      discrimination.

24             THE COURT:  How about that she was opposing conduct or

25      highlighting conduct which she believed was harassing?

11:00:15AM 1          MS. SCOTT:  For — but — the law says that it's just

2      not harassment, it has to be gender harassment.

3          THE COURT:  Okay.  So maybe this — okay.  You're

4      afraid that conduct — so conduct related to her gender?

5          MS. SCOTT:  Yes, Your Honor, that's what we are

6      asking.

7          THE COURT:  That would include both discrimination and

8      harassment.

9          MS. SCOTT:  Yes, Your Honor, that's — we're fine with

10     that.

11         And the other thing I would say is that the Court

12     highlighted that they're male managers and yet female managers

13     can do this as well.  They're going to find —

14         THE COURT:  That's argument, that's argument.  The

15     case is about four male managers.  I appreciate what you're

16     saying.  The case is about four male managers.

17         Yes, Mr. Lieber.

18         MR. LIEBER:  Yes, Your Honor.  I don't think that

19     necessarily it's what Kelly Vay believed at the time.  The

20     intent is on the part of the managers.

21         THE COURT:  So what are you pointing to?  What

22     language are you concerned about?

23         MR. LIEBER:  That I'm not sure exactly what your

24     language is at this moment, because —

25         MR. LORENCE:  It was opposed gender-related conduct.

11:01:15AM 1          THE COURT:  About the managers' conduct related to her

2  gender.

3          MR. LIEBER:  That's all right.  That would be all

4  right.

5          THE COURT:  Okay.

6          MR. LIEBER:  But it — there shouldn't be any test as

7  to what she knew or believed at the time.

8          THE COURT:  No, no.  I agree.

9          MR. LIEBER:  Okay.

10         THE COURT:  I think the County is correct about the

11  managers' conduct related to her gender.

12         MR. LIEBER:  All right.

13         THE COURT:  Okay?

14         MR. LIEBER:  Just one other slight thing, Your Honor.

15         THE COURT:  Sure.

16         MR. LIEBER:  Okay?  Your Honor, at motion in limine —

17  your order of January 17th on the CORE matter, you indicated

18  that the audio recording shall not be admitted as evidence of

19  character or bad acts but may be used if Ms. Vay argues the

20  same profane language used by male co-workers constitutes part

21  of a hostile work environment.

22         Now, our understanding of that is if somebody

23  including Ms. Vay says that somebody said bitch but she doesn't

24  argue that that's part of the hostile work environment, that

25  that word can come into court without opening the door.

11:02:30AM 1        THE COURT:  If she opens the door and says that word

2  is routinely used, that word is used in the parlance of the

3  office, yes, then that word is coming in on both sides.

4        MR. LIEBER:  Okay.  Well, if she — she would not be

5  opening the door to say that — she would just be stating the

6  statements of her managers.  She would not be saying that it

7  would be used in the parlance of the office.

8        THE COURT:  Why?

9        MR. LIEBER:  She wouldn't be doing that.

10        THE COURT:  I mean if it's a common term used around

11  the office, why not?

12        MR. LORENCE:  Your Honor, it's —

13        THE COURT:  One at a time, counsel.

14        MR. LIEBER:  It's not — it's not our case.  It's

15  not — it's not —

16        THE COURT:  No, it's the defense case.  I appreciate

17  you don't want to hear it, but isn't it the defense case that

18  in some sense this was the parlance around the office?  And

19  for — to use that term as being hostile or somehow evidencing

20  a pervasive harassment, that's a word that both she used and —

21  now, if she doesn't use it, that's a fact issue you can raise;

22  but if it's used by everybody, nobody complains about it —

23        MR. LIEBER:  I'm just looking for guidance.

24        THE COURT:  That was the intent of the order.  The

25  intent of the order was if it's used in parlance and it's

11:03:42AM  1  opened up in the Plaintiff's case, then defense can certainly
         2  raise it.
         3          MR. LIEBER:  Okay.  But our — your ruling pertained
         4  to this CORE, to this recorded telephone call.
         5          THE COURT:  Right.
         6          MR. LIEBER:  Okay.  And obviously we think that's
         7  highly prejudicial.
         8          THE COURT:  Right.
         9          MR. LIEBER:  And the Court agreed, and we don't
        10  want — we don't want to think that we opened the door to that
        11  if someone just says that in a statement someone used the word
        12  bitch.  That doesn't open the door.  It only opens the door if
        13  one — if the Plaintiff argues, as you put it, that this is —
        14  that this word is part of a hostile work environment, which we
        15  don't intend to argue.
        16          THE COURT:  Oh, okay.  I thought you did.
        17          MR. LIEBER:  No.
        18          THE COURT:  You certainly did in summary judgment.
        19          MR. LIEBER:  Right.
        20          THE COURT:  You certainly did at summary judgment.  At
        21  summary judgment it was literally — I mean I think, if I
        22  remember correctly, it was one of the words that struck me as
        23  being throughout the summary judgment motion as a word that was
        24  used as to evidence — some type of animus towards women.
        25          If you're saying — I'm going to make a record.  If

11:04:47AM 1    you're saying you're not arguing that the word bitch has

2    anything to do with a severe, pervasive environment, then I

3    will take that and make that a finding and it will not be part

4    of your claim.  You will not mention it as being a severe or

5    pervasive term.

6              MR. LIEBER:  Right.

7              MR. LORENCE:  But —

8              MR. LIEBER:  Go ahead, Mr. Lorence.

9              THE COURT:  Mr. Lorence, please.

10             MR. LORENCE:  Yes.  Your Honor, I believe our position

11    was during summary judgment not that — cursing was certainly

12    pervasive.  It was —

13             THE COURT:  Sure.

14             MR. LORENCE:  It was like a locker room.  I mean that

15    sort of — on summary judgment we emphasized in particular a

16    statement that Mr. Pilarski made when she complained about

17    discrimination —

18             THE COURT:  Right.

19             MR. LORENCE:  — and he got right in her face and

20    said:  Bitch, it's none of your business.  That was our —

21             THE COURT:  But if that's —

22             MR. LORENCE:  If we gave the impression that our

23    argument was bitch was pervasive — I mean I don't know if it

24    was or not.  Not that I know of.  But our position was —

25             THE COURT:  I saw it several times, didn't I,

11:05:54AM 1   Mr. Lorence?

2         MR. LORENCE:  I think twice maybe.  I think it was

3   related to --

4         THE COURT:  Didn't I see the women -- didn't I see

5   that phrase, a woman-to-woman phrase.

6         MS. SCOTT:  Yes, you did, Your Honor.

7         THE COURT:  I saw it more than just -- I mean --

8         MR. LORENCE:  I may be mistaken --

9         THE COURT:  If you're saying that it's out as -- if

10   you're saying, Judge, we're going to tell them and I'm going to

11   instruct the jury that the word -- you're going to say bitch is

12   not one of the words we're concerned about, then we have a fine

13   line in the sensibilities of a jury as to whether bitch is a

14   word that has offensive meaning as opposed to some of the other

15   words that were used here that have offensive meanings.

16         MR. LORENCE:  Right.

17         THE COURT:  Okay?  So I did it this way.  I thought I

18   was being careful instead of saying -- since you want the word

19   bitch in as a general hostile term --

20         MR. LORENCE:  I do.

21         THE COURT:  Well, if you open it up, then they get to

22   use it.

23         MR. LORENCE:  I agree.  And I think really what our

24   argument is about the use of the bitch, it depends on the

25   context.

11:06:53AM 1          THE COURT:  Oh, I agree.

2          MR. LORENCE:  So, for example —

3          THE COURT:  I know.

4          MR. LORENCE:  — you know, sometimes you say to your

5     wife — or your wife says to you, more likely:  Boy, you know,

6     I could really kill you.  Well, they don't mean that.  On the

7     other hand, if you're at work and a manager comes up and gets

8     in your face and says:  Bitch, it's none of your business,

9     that's a whole different story.  And we would like to bring

10    that up.  But if the Court rules we can't, then —

11         THE COURT:  I'm not saying you can't.

12         MR. LORENCE:  Well, I mean if the Court rules that if

13    we bring it up, the CORE recording comes in —

14         THE COURT:  Yeah, because it — if the term — because

15    we aren't desensitized.  I mean I think part of my opinion is

16    we aren't desensitized as lawyers are, in all candor, okay?

17    These lawyers, all right?  And most people are not.  All right?

18         So I think that — if you're going — I have the

19    impression that bitch was one of the words that was going to be

20    used as evidence; and if it is, then I think the defense has a

21    fair shot.  I don't think how you're going — how in this case

22    is going to be — how are you going to get that, which I think

23    is, you know, important evidence in the case about in-the-face

24    statement —

25         MR. LORENCE:  Yeah; yes, sir.

11:07:59AM 1          THE COURT:  Okay?  I can say this:  How are you going
          2     to get it in without saying the word bitch?
          3          MR. LORENCE:  What's that?
          4          THE COURT:  How are you going to get it in without
          5     saying the word bitch?
          6          MR. LORENCE:  Yeah, good question.
          7          THE COURT:  So I think my ruling stands.  I think
          8     everybody is better off the way the ruling is.
          9          MR. LORENCE:  Okay.  If I could just add — may I say
         10     one other thing, Judge?
         11          THE COURT:  Yes, sure.
         12          MR. LORENCE:  Thank you very much, sir.
         13          The point I was making about context —
         14          THE COURT:  Yeah.
         15          MR. LORENCE:  — you know, any word — the meaning of
         16     that word depends on the context, the other language —
         17          THE COURT:  Those eight good citizens will understand
         18     exactly that.
         19          MR. LORENCE:  And — and related to the use of the
         20     word that Kelly used in that — in that tape, she was
         21     frustrated, as sometimes women are with other women, and
         22     sometimes they use that word —
         23          THE COURT:  And men are —
         24          MR. LORENCE:  Pardon me?
         25          THE COURT:  And men are.  I mean it's not a — it's

11:08:43AM 1    not a gender-based frustration.

2              MR. LORENCE:  When she used it.

3              THE COURT:  But that's context.

4              MR. LORENCE:  But when he used it, that's where the

5    gender comes in.

6              THE COURT:  That's why a good lawyer like you knows

7    how to make that argument.  Context is exactly what lawyers do,

8    especially in these cases.  The problem is -- the problem is

9    you have to -- I can't on this palette, on this record start

10   parsing through in the context because I haven't heard all the

11   evidence.  But from the record it looks like the term was used,

12   and good lawyers -- both sides -- can argue that's not -- and

13   Ms. Vay and whoever said it from the County can say that's not

14   what I meant by that.

15             MR. LORENCE:  I'm just giving it a shot, and I think

16   your ruling was a fair one, so thank you for hearing me out.

17             THE COURT:  Okay.  Anything further so I can get the

18   jury up here?  I want to get started --

19             MS. SCOTT:  Your Honor, I did have a question on

20   logistics.

21             THE COURT:  Okay.

22             MS. SCOTT:  I know from reading the Court's chambers

23   rules that we're supposed to stay at counsel table or use --

24   I'm wondering if we can -- if we are able to, for opening

25   statement, stand in front of our jury --

11:09:42AM  1          THE COURT:  Well, it's a great point.  Those chambers

2    rules are written for a different courtroom, in all fairness,

3    not a courtroom as majestic as these.

4          So the only issue is that you can't get within four or

5    five feet of the jury, either side.  You're not putting your

6    hand anywhere on that rail.  Don't get your hand on that rail.

7    Four or five feet back.  The main thing is that the madam court

8    reporter can hear every word you say.

9          MR. LORENCE:  I'm sorry, Judge?

10          THE COURT:  So the madam reporter can hear every word

11    you say.  All right?  If you go over there and we lose you,

12    that's your client's prejudice.  It's not my job to correct

13    directly.  I'm just saying — so essentially stay around this

14    podium, four or five feet back from the witness box.

15          MS. SCOTT:  Would it be helpful — are these — all

16    these microphones on?  Would it be helpful if we moved the

17    witness microphone further out when we're doing openings?

18          THE COURT:  If you wish.  I'm saying don't get any

19    closer than that.  Don't get any closer.  I don't want you in

20    the jury's face.

21          MR. LORENCE:  Which podium are we talking about?

22          THE COURT:  I think we're talking about the witness

23    stand, right?

24          MR. LORENCE:  Okay.

25          THE COURT:  Or you use the podium; you can bring the

11:10:49AM 1   podium over, too.

2                    MS. SCOTT:  There's a podium.

3                    MR. LORENCE:  Right, thank you.

4                    THE COURT:  Any other logistics?

5                    MS. SCOTT:  Your Honor, we do have — we thought we

6    would be doing the jury selection in the jury assembly room

7    because that's normally what has happened for me, so I had

8    instructed my secretary to bring all of our exhibits and

9    documents in because they only start at 8:30.  While — and I

10   said we wouldn't be here because we were going to be picking a

11   jury.

12                    So I think they're outside and so may they come in now

13   and —

14                    THE COURT:  Sure.

15                    MS. SCOTT:  Thank you, Your Honor.

16        (Off the record discussion.)

17        (Jury panel seated.)

18                    THE COURT:  Please be seated.

19                    Good morning, ladies and gentlemen.

20                    ALL PRESENT:  Good morning.

21                    THE COURT:  Welcome to your Federal Court.  Welcome to

22   the United States District Court for the Western District of

23   Pennsylvania.  I am new here like you.  I am here from

24   Philadelphia — no booing.

25        (Laughter.)

11:27:23AM 1              THE COURT:  No booing.  I hear you.  That's our

2       expertise, booing.  No booing.

3              But I have been asked to help out, and I am honored to

4       be here.  I spent a lot of years in Pittsburgh, so it's nothing

5       new for me to be here, so I love -- I'm a big, big fan of

6       Pittsburgh.  In fact, I have Pirates tickets.  I come out on

7       Sunday with my son.

8              So I'm on the western part of eastern Pennsylvania, so

9       I'm out towards Lancaster, so it's not that far for me to get

10      here, relatively.  You came probably a little closer than I

11      did.  So welcome.

12             Look, jury duty -- you're sitting out there thinking:

13      Oh, God I can't believe I have to go into this.  I can't

14      believe I got selected for jury duty.  But let me tell you a

15      little about the magnificence of it.

16             One second of civics if you can let me burden you for

17      one second.  I want you to think about this as if you were one

18      of the parties here.  See, in most countries of the world there

19      is not a jury system.  And men and women who wear black robes

20      decide cases.  Our founders -- now, I'm from Philadelphia, and

21      we're the first Federal Court.  So you're the first Federal

22      Court.  It was the Pennsylvania Federal Court.  And I'm the

23      hundredth judge in that court.  From -- George Washington put

24      the first one on my corner and I was a hundred.

25             So we are very well aware in the United States system

11:28:47AM 1  of the value of jurors because you know what happens?  Judges

2  and lawyers tend to become a little bit hardened to things.  We

3  look at everything clinically.  We understand it as lawyers.

4  We understand it as judges.

5         And the framers, particularly Washington and Madison,

6  on the corner across the street from my chambers — and if

7  you're ever in Philadelphia, please stop by — literally across

8  the street from the Liberty Bell, decided they didn't want

9  that.  They wanted more of the English jury system for certain

10 cases, but they wanted it for all cases because they loved the

11 majesty of the jury.

12        When you're selected for that jury, you and I are both

13 constitutional officers.  The only time in your life you will

14 be a constitutional officer under Article III of the

15 United States Constitution is in a jury trial.  You have the

16 same power given to you from the United States Constitution

17 that I have.

18        Now, this past weekend taught us something, right?

19 Taught us about the effect of Federal Courts and what —

20 whatever you believe or don't believe, what you have to

21 understand is the Federal Courts are much different than where

22 you may have once spent jury duty in a state court.  This is a

23 very significant court.  You saw what happened on Saturday

24 night in a Federal Court.

25        Now, you don't have that same mission, thank God — I

11:30:14AM 1    saw a big sigh of relief.  That's not your issue.  But you have

2    also difficult issues, issues that good lawyers and earnest

3    clients could not work out between themselves.  That doesn't

4    mean one's mean or the other's not nice or they couldn't figure

5    it out.  Why can't they figure it out?  I have to be here on a

6    cold January day.  It's because they have real disputes and the

7    facts are really disputed.

8           And the framers decided rather than have somebody who

9    is appointed by the President of the United States for life

10    decide these cases, they want the common sense of the jury.

11    They want you, who don't — who know nothing about these people

12    to use your common sense and say:  What's the truth here?

13    Because the truth is going to be two different truths, ladies

14    and gentlemen.  I assure you of that.

15           I promise you drama.  Every jury trial is drama

16    because one side says X and the other side says Y.  And you and

17    only you — not me, not these good lawyers, not their

18    clients — only you get to decide the law.  Not some Senator in

19    Washington or Harrisburg, not some President in Washington.

20    Not some judge in a black robe.  Eight citizens decide the law

21    here.  And so welcome.

22           I was a trial lawyer for 27 years.  I love the jury

23    system.  I lost trials and I still loved the jury system.  So

24    thank you for being here.  Thank you for making an effort on a

25    cold Monday to come down here.

11:31:51AM 1          What's going to happen now is something called voir

2    dire.  I'm going to ask you some questions.

3          Counsel, you're welcome if you wish to turn around

4    because the ladies and gentlemen of the venire are going to be

5    holding up numbers.  So if you wish to turn your chairs around

6    or whatever is easier for you — I'll have you introduce

7    yourselves in a moment.  It might be easier for you to see

8    everybody if you don't mind.

9          So, look, this is not a prying examination.  I'm not

10   here to ask you about all kinds of questions you don't want to

11   talk about.  That doesn't really matter.  What I'm here to talk

12   about is the issues in this case and whether you have any kind

13   of particular background.

14          Remember, if you were one of these two parties, you

15   don't want to — you want to have a fair and impartial jury.

16   You want to have somebody who is not the brother-in-law of one

17   of the parties.  You want to have somebody who doesn't have

18   experience:  Oh, my God.  I had the same thing happen to me.

19   Right?  That's not really very fair because your frame of

20   reference is going to frame the facts here.

21          We have to make sure you have a clean palette.  We

22   have to make sure that you don't really know anything about

23   these people.  Again, because all we want you to apply is your

24   common sense to the evidence.  We don't want you going home and

25   Googling, saying:  Oh, I know that person.  I know that person.

11:33:10AM 1    I saw them at the supermarket.  They never paid for their

2    candy.  If that happened, you have to raise your hand because I

3    need to know that.  For the same reason you would want to know

4    if you're sitting there, right?  You'd want to know.  If

5    somebody doesn't like you because of the way you tip at the car

6    wash, you'd want to know that.

7            So let's talk a little about what this case is about.

8    I'm not going to introduce the lawyers.  I'll have the lawyers

9    introduce themselves, where they work, their law firms and who

10   their clients are.  And then we'll talk a little about it.

11           Up front with we again, my name is Judge Mark Kearney.

12    I told you about my background.  With me to my right you'll

13   see the whole trial is my trusted and very talented law clerk.

14   He's to my right.  Right in front of me is my deputy clerk;

15   she'll be meeting with you throughout the trial, Keirstin.

16   This is Jody, this is Kierstin, and the madam reporter is to my

17   left and your right.  Everything that's said in the courtroom

18   is taken down by a court reporter.  You will get used to that.

19           And I'll introduce the lawyers.  But let me first talk

20   about two things you want to know.  So, the last case I had

21   that was of this kind took about 27 days.  I've got great news

22   for you.  This case isn't going to take anywhere near that

23   long.  Okay?  This case, at most — and these are good lawyers,

24   they think they're going to be done — I'm pretty sure they're

25   going to be done in seven days, that is 17 working days.

11:34:35AM 1          These are really good lawyers.  They won't spend your

2    time, they won't repeat themselves.  They won't duplicate

3    things.  They know you know how to learn.  They know you

4    understand things.  They'll get to the point.  So we're all in

5    an effort to get you the information so you can make a

6    decision.

7          Okay.  Here's the kind of case.  It's a civil case.

8    Okay?  It's a civil case.  It's about money damages.  It's not

9    a criminal case.  No one is going to prison because of your

10   decision and my sentence.  This is a civil case where a former

11   investigator, a woman by the name of Kelly Vay, she worked with

12   the Allegheny County Medical Examiner's Office; and she's

13   seeking damages from her former employer, Allegheny County, and

14   four male managers.  Their names are Robert or Bob Huston,

15   Steve Pilarski, Michael Baker, and Michael Chichwak, alleging

16   that they discriminated against her at work because of her

17   gender, her sex, female.  They retaliated against her with

18   adverse employment actions because of her complaints about the

19   managers' conduct related to her gender, and they engaged in a

20   severe or pervasive pattern of sexual harassment towards her

21   and other women working at that time in the Allegheny County

22   Medical Examiner's Office.  That's what the Plaintiff says.

23          The Defendants who I just mentioned, Allegheny County

24   and the four men, deny discrimination.  They deny retaliation.

25   They deny sexual harassment.  And they instead argue that

11:36:23AM 1  Ms. Vay did not suffer from any discrimination, from any

2  retaliation, or any hostile work environment by the County or

3  by the four male managers.  But, instead, they argue that

4  Ms. Vay was a volatile employee who they appropriately

5  disciplined and treated appropriately.  Two different stories.

6  It's going to be in your hands at some point to decide the

7  truth.

8           I'm now going to ask the fine lawyers first for    Ms.

9  Vay and then for the County to introduce themselves and where

10  they work and introduce their client and the town that you're

11  from, please.

12           First for the Plaintiff.  Mr. Lorence.

13           MR. LORENCE:  Good morning.  I'm Michael Lorence.  I

14  represent Kelly Vay, the Plaintiff.  I'm a sole practitioner.

15  I do civil rights, employment discrimination, and criminal

16  defense cases.  My office is in Squirrel Hill.

17           Thank you.

18           MR. LIEBER:  I'm Jim Lieber.  I represent

19  Kelly Vay.  I'm at the law firm of Lieber, Hammer, Huber and

20  Paul, which is in Shadyside; and we do civil litigation.

21           THE COURT:  Thank you.

22           Mr. Huber?

23           MR. HUBER:  Hi, good morning.  My name is Tom Huber

24  and I work with Jim at the same firm and I live in Mt. Lebanon.

25           THE COURT:  Thank you.

11:37:55AM 1           Mr. Lieber, would you kindly indicate to everyone who

2    Ms. Vay is, please.

3           MR. LIEBER:  I'm sorry.

4           Kelly, would you please stand?

5           This is Kelly Vay, our client.

6           THE COURT:  Thank you.

7           Thank you, Ms. Vay.

8           Now I'd ask the lawyers for the County, Ms. Scott,

9    would you introduce your counsel and the men and the County you

10    represent.

11           MS. SCOTT:  Yes, Your Honor.

12           Good morning, everyone.  I'm Virginia Scott; people

13    call me Ginny.  I happen to be an Assistant County Solicitor

14    with Allegheny County.  I work in the Allegheny County Law

15    Department, and it's just down the street.  I do civil defense,

16    mostly employment law, and civil rights matters.  This is my

17    colleague Fran; she'll introduce herself.

18           MS. LIEBENGUTH:  I'm Frances Liebenguth.  I also work

19    at the Allegheny County Law Department along with Ginny

20    represent the four Defendants and Allegheny County in this

21    case.

22           THE COURT:  Miss Scott, will you kindly ask your

23    clients to stand so the jury can see them and if you would

24    introduce them for us, please.

25           MS. SCOTT:  Sure.

11:38:56AM 1        First I would like to introduce Steve Pilarski. He

2  is — he was with the Medical Examiner's Office and now he is

3  the Deputy County Manager with Allegheny County.

4        I'd next introduce you to Robert — we call him Bob —

5  Huston. He is with the Medical Examiner's Office today and he

6  is the manager of — the head of the administrative offices of

7  the Medical Examiner's Office.

8        Next, I'll introduce — sorry, folks — Michael Baker.

9  Mike Baker is — was with the Medical Examiner's Office for

10  about nine months. He comes from Indiana County, and he is

11  back in Indiana County now; and he is a County Commissioner

12  with Indiana County.

13        Lastly, but not least, I'll introduce to you     Mike

14  Chichwak. Mike Chichwak is from Allegheny County. He was with

15  the City of Pittsburgh for a long time. He was with the

16  Medical Examiner's Office for a very long time, and he retired

17  in 2014 and now lives in sunny Houston.

18        THE COURT: Thank you, Ms. Scott.

19        MS. SCOTT: You're welcome.

20        THE COURT: Please be seated. Thank you.

21        MR. LORENCE: Judge, I'm sorry, could I introduce her

22  dad? He's in the back.

23        THE COURT: No, not a party. Thank you. You can do

24  that certainly doing openings.

25        MR. LORENCE: Yeah, sure. Thanks, Judge.

11:40:20AM 1          THE COURT:  Certainly.

2          Has anyone heard of this dispute, any member of the --

3    Oh, yes.  Before anybody answers a question -- thank you --

4    madam deputy is now going to swear you, if you would please

5    rise and raise your right hand.

6        (Jury venire sworn.)

7          THE COURT:  Thank you, ladies and gentlemen.

8          Has anyone before they -- before I just described this

9    case in very general terms, has anyone heard anything about a

10   dispute between Ms. Vay and her former employer, Allegheny

11   County, and people at the Medical Examiner's Office?

12         And the way we do this is just hold up your number if

13   the answer is affirmative.  That is yes.  If the answer is yes,

14   then hold up your number and we'll take your number down and we

15   may ask you questions privately later on.

16         Anybody heard anything about this matter?

17         Okay.  The answer is no.

18         I've just identified to you the parties.  You've seen

19   them.  Has anybody here -- does anybody here know either the

20   four gentlemen or Ms. Vay before they came in this room?  Did

21   they know -- had any social, business dealings with these

22   people?

23         Okay, thank you.

24         Does anyone here have any business dealings or work

25   for Allegheny County which is one of the Defendants here?

11:41:56AM 1                Okay, thank you.

2                I'm now going to list a series of witnesses.  These

3        are people that don't necessarily come to court, but they may

4        have — you may see their names in e-mails or other documents

5        so it's important that if you know them — because it may

6        affect the way you see an e-mail if you know them, if they're

7        your neighbor.  Just raise your hand as I say each name if you

8        know anything.

9                I've introduced you to Ms. Vay and I've introduced you

10       to the four gentlemen.  No one knew them or had any dealings

11       with them.  Let's continue with some other names if I may.

12               Jennifer Sullivan Dwyer of Pittsburgh.

13               Alison Bixby of Pittsburgh.

14               Melissa Bogoevski, B-O-G-O-E-V-S-K-I, formerly of

15       Pittsburgh and now of Michigan.

16               Anthony Bofo of Carnegie, Pennsylvania — that's that

17       eastern — I'm sorry, guys.  That's my eastern background.  I'm

18       not quite sure what that is.

19               Curtis Williams of Pittsburgh.

20               Fred Manno of Pittsburgh.

21               A Mr. Keith Vay, who is the Plaintiff's father, who's

22       from Westmoreland County.

23               Dr. Safdar Chaudhary, C-H-A-U-D-H-A-R-Y.  He's from

24       Washington County.

25               MR. LIEBER:  That would be Westmoreland, Your Honor.

11:43:32AM 1           THE COURT:  Thank you very much, counsel; I had it as

2  Washington County.

3           Mr. Lieber points out to me that's Washington —

4  Westmoreland County.  Okay.  I had Export PA but the wrong

5  county.  I'm sorry, ladies and gentlemen.  Anybody know the

6  doctor?

7           All right.  Richard Lorah, L-O-R-A-H, of Allegheny

8  County.

9           Here's a name everybody knows, but it's a particular

10  one, a John Smith.

11    (Laughter.)

12           THE COURT:  He's from Pittsburgh.

13           Okay.

14           A Mr. Charles Moffatt, who was the former –– the

15  retired police superintendent of Allegheny County.

16           Leonard Longo of Pittsburgh.

17           Nichole Nagle, N-A-G-L-E, of Pittsburgh.

18           Darlene Craig of Allegheny County.

19           Dave Smith of Washington County.

20           Dr. Karl E. Williams, a medical examiner here in

21  Pittsburgh.

22           Marty Coyne of Pittsburgh.

23           Stephanie Bollard, B-O-L-L-A-R-D, of Allegheny County.

24           Desmond Brentley of Allegheny County.

25           Susan Danahauer of Allegheny County.

11:45:10AM 1     Jerry Hollihan of Allegheny County.

2     I'm going to say his name again, but just to be clear,

3 Mr. Carnegie of Allegheny County.

4     Nicholas Medvid of Allegheny County.

5     No. 16.  Anyone else?

6     Sorry, did you —

7     JUROR:  What name did you say?

8     THE COURT:  No. 16 put his hand up as affirmative.

9     Do you also know a person by the name of     Nicholas

10 Medvid?

11     No. 16.

12     JUROR:  Your Honor —

13     THE COURT:  Yes, sir.

14     JUROR:  You asked about Allegheny County; I'm retired

15 from Allegheny County Port Authority.

16     THE COURT:  Okay.  Thank you, sir.  What number are

17 you, sir?

18     JUROR NO. 20:  No. 20 here, but I'm number —

19     THE COURT:  No. 20 is what we're talking about today.

20 Thank you, though.  That other number we'd lose track of you.

21 No. 20 for purposes of today.  Okay.

22     All right.  Erin Trainor Medvid, M-E-D-V-I-D.  She's

23 also of Allegheny County, I'm sorry.

24     Alesia, that's A-L-E-S-I-A, Smith of Allegheny County.

25     Lisa Leone of Allegheny County.

11:46:26AM  1            Eve Mirt, M-I-R-T of Allegheny County.

2            Corey Mirt of Allegheny County.

3            Bob Gourley, G-O-U-R-L-E-Y, of Allegheny County.

4            MS. SCOTT:  Your Honor, that's Barb.

5            THE COURT:  Did I say Barb?

6            MS. SCOTT:  I thought I heard Bob.

7            THE COURT:  If I said Bob, I apologize to Barb.  It's

8    Barb Gourley of Allegheny County.  I'm sorry.

9            Thank you, counsel.  I thought I said Barb, but I may

10   have said Bob.

11           Barb Gourley of Allegheny County.

12           Lisa Slavinowski Earley of Allegheny County.

13           Nelson Earley of Allegheny County.

14           Annie Marburry of Allegheny County.

15           Elaine Fahringer of Allegheny County.

16           Don Kanai, K-A-N-A-I, of Allegheny County.

17           Ed McGregor of Allegheny County.

18           Jake Lifson, L-I-F-S-O-N, Esquire, of Pittsburgh.

19           Joe Gavlick of Allegheny County.

20           And Jason Ditzenberger of Allegheny County.

21           Okay, thank you, ladies and gentlemen.

22           Now I'm going to ask just you some general questions.

23   Again if the answer is yes to these questions, just put up your

24   number.

25           Have you or are you presently or have you ever been or

11:47:56AM 1   any member of your family been an employee of the Office of the

2   Medical Examiner of Allegheny County?

3          Have you now or ever been — and No. 20 is going to

4   tell me yes on this — an employee — he employed by Allegheny

5   County?

6          No. 20 told me yes.

7          I'm sorry, No. 17, yes.

8          Anybody else?

9          Okay.

10          Have you or any member of your immediate family that

11   lives with you, someone you see every day, ever had a dispute

12   with a boss or co-employee of an opposite sex where you thought

13   they treated you differently because of your gender?

14          That's just a yes or no.  We can talk about it at side

15   bar, but just a yes or no.

16          Have you ever been involved, interviewed with, been a

17   party to an internal workplace investigation into charges of

18   someone being treated differently because of their gender?

19          No. 2, 11, 13, and 23.

20          Have you ever sued a former employer after leaving

21   your job?

22          Has a former employer ever sued you upon you leaving

23   your job?

24          Have you ever been in any type of dispute, literally

25   other than a parking ticket, with Allegheny County?

11:49:45AM 1        Have you or any member of your immediate family ever

2    been employed by any Medical Examiner or Corner's Office in any

3    county or city?

4        Have you or any member of your immediate family ever

5    been employed as an investigator on behalf of a municipality,

6    state, federal government?

7        Have you or any member of your immediate family ever

8    claimed that the workplace that you worked in suffered or had

9    certain types of harassment or discrimination against either

10    male or females?

11        Twenty-three.

12        Have you or any member of your immediate family ever

13    been terminated from your job because you complained about

14    something at work that you thought was in the best interests of

15    the business?

16        Flipping the coin, have you ever terminated anybody

17    because you — well, have you ever — anybody here in a

18    position of ever firing anybody?

19        Eighteen, 23, 28, and 30.  Thank you — I'm sorry, 25

20    as well.  Okay.

21        MS. SCOTT:  Sorry, I missed the numbers.

22        THE COURT:  Would you do it again?  I'll read them out

23    again, like snow numbers.  Eighteen, 23, 25, 28, and 30.

24        MS. SCOTT:  Thank you, Your Honor.

25        THE COURT:  Thank you.

11:51:35AM 1        Have you or any member of your immediate family ever

2  filed a lawsuit that -- in which you were seeking money damages

3  because of some personal harm to you?

4        No. 11.

5        JUROR NO. 11:  My wife had worked --

6        THE COURT:  Sir, I'll do it at side bar.  No. 20.

7        Anybody that has a question, we'll go to side bar.  I

8  don't want to pry into you in front of everybody.

9        No. 18.  Thank you.

10        JUROR:  Can you repeat the question, please?

11        THE COURT:  Certainly.

12        Have you or any member of your family ever filed a

13  lawsuit or filed a lawsuit -- and I'm going to ask the second

14  question next -- been sued, but have you ever filed a lawsuit

15  in which you sought money damages for some personal injury you

16  thought to you?

17        I think I have the same answers then, 25 again hand

18  up, okay.

19        Let's turn the coin again.  Have you ever been sued by

20  anyone who claimed that you harmed them in a personal way in a

21  lawsuit?  Ever been sued in a lawsuit by anyone?  Okay.

22        Have you -- do you or any member of your immediate

23  family have any medical training in emotional distress,

24  physical harm arising from emotional distress, post-traumatic

25  stress disorder, those types of ailments?  Do you or any member

11:53:05AM 1  of your immediate family have any training in that area?

2        No. 8, 10 and 27.  Thank you.

3        And this is the question I started with and now I'm

4  going to stop with:  You heard a little bit about the case.

5  And it's a little bit like Battleship, right?  I'm giving you

6  the puzzle a piece at a time, and I know it's hard to

7  understand it, but I'm going to do it this way.

8        The lawyers are going to get a chance to talk to you

9  at side bar if you want to, but I want to ask it this way:

10  Knowing what you know now, the little bit that you know now, is

11  there any reason in your mind that you would not want to be a

12  juror if you were sitting as either the County or one of these

13  four gentlemen or Ms. Vay?

14        In other words, has anyone here decided:  I really

15  can't be a fair and impartial juror because I just don't like

16  the way people look or the sound of this case?  It's okay.

17  Because, remember, think if you were there.

18        Thank you.  Thank you for honoring your oath.

19        I'm going to ask counsel to come to side bar with me,

20  and I'm going to ask them for any additional specific

21  questions, and then we may call up certain numbers -- and we'll

22  be very private, we'll be over here on the side.

23        We'll just take a few moments on the side over here to

24  follow up.  And then we'll come back to you.

25        Thank you, ladies and gentlemen.

11:54:39AM 1      (At side bar.)

2             THE COURT:  So you each received these questionnaires?

3             MS. SCOTT:  Uh-huh.

4             THE COURT:  Okay.

5             Come on, Mr. Lorence.  Come in.

6             MR. LORENCE:  Excuse me.  Sorry.

7             THE COURT:  Okay.  So I want to first confirm that

8  everyone received the questionnaire that was circulated to the

9  jury before we began my voir dire.  Is that correct?

10            First the Plaintiff.

11            MR. LIEBER:  That's correct.

12            THE COURT:  You have received a copy of it.

13            And you received a copy from your side, the copy of

14  the jurors' questionnaires.

15            MS. SCOTT:  Yes, Your Honor.

16            THE COURT:  Okay.  Let's start first with the

17  Plaintiff.  Is there any generalized — general question that

18  you would like to ask them that I have not asked as related to

19  this case?

20            MR. LORENCE:  Yes.

21            THE COURT:  Okay.  Which question?

22            MR. LORENCE:  One of your questions or one I'd like to

23  ask?

24            THE COURT:  No, I'll ask it.  What question would you

25  like to be asked?

11:56:16AM 1        MR. LORENCE:  Okay.  Well, my question would be:  Do

2  you have any —— I'm not sure how to put it —— the topic is

3  bossy women.

4        THE COURT:  No.  I saw that.  It's denied.  I already

5  looked at it.  It's denied.

6        MR. LIEBER:  But, Judge, would you ask if —— there's

7  going to be very raw language in this case ——

8        THE COURT:  That's a good point.

9        MR. LIEBER:  —— would they be offended by that.

10       THE COURT:  That's a great one.  That's a good

11  question.  I saw your bossy one and I struck it.

12       MR. LORENCE:  Okay.

13       THE COURT:  You've preserved it.  But that language is

14  a good one.

15       MR. LIEBER:  This is an old case.  It's like ——

16  relatively old case ——

17       THE COURT:  You mean the conduct.

18       MR. LIEBER:  —— and would that affect them in any way?

19  In other words, would they hold that against either party just

20  because it's old?  I don't want them to think the Plaintiff sat

21  on their rights or anything like that.  It didn't happen and

22  it's been passed around ——

23       THE COURT:  I'll address that.

24       MS. SCOTT:  Your Honor, it's not an old ——

25       THE COURT:  It's not, and I'll address ——

11:57:13AM 1     MS. SCOTT:  I'm sorry.

2     THE COURT:  And I will address that myself without

3 asking the question.  That's a fair point, but I'll be asking

4 the question.

5     MS. SCOTT:  Your Honor, the point I make is that

6 they're trying to saying it's more than filing the lawsuit.  We

7 have a dissent, that she did not report these things --

8     THE COURT:  I'm just saying you don't take any time of

9 anything.  It's an argument of lawyers.

10    Another question generally that's not on your sheet

11 because I already struck what's on your sheet, so any others

12 that you have?

13     MR. LORENCE:  Did I bring up the women swearing issue?

14     THE COURT:  I'm going to do the swearing issue

15 generally.

16     MR. LORENCE:  Okay, yeah, because --

17     THE COURT:  It's granted.

18    Anything else?

19     MR. LIEBER:  I don't know how to raise this, but do

20 they -- can they regard a public agency, just because something

21 is a public agency as opposed to a company, where they pay

22 taxes, for example, would that affect them in any way?  Would

23 they be --

24     THE COURT:  The question that would be asked -- I

25 thought you were going to ask for this one:  Does the fact that

11:58:20AM 1  someone is a public official or former public official affect

2  the way you view the credibility of the witness.  Is that

3  something you would like to have charged?

4         MS. SCOTT:  We do want that issue because of

5  Mike Baker.

6         THE COURT:  That's what I was going to say.  That's

7  right.  So I'll ask it that way.  I thought I'd get a side bar,

8  so I didn't want to do it voluntarily.  So I'll address it that

9  way.  I'll address the fact that just because it's a public

10  agency and because there's officials here, what public

11  officials say — you see what I'm saying?

12         In fact, I didn't mention Rich Fitzgerald because I

13  didn't see him anywhere in the thing; he's in a newspaper

14  article.

15         MS. SCOTT:  I think the closest we're going to get is

16  the medical examiner and the former superintendent.

17         THE COURT:  Do you want Rich Fitzgerald?

18         MR. LIEBER:  I think we should ask.  If they think

19  that he's aligned one with one side or the other, it could lead

20  to —

21         THE COURT:  Did you see where he's headed from?

22         MR. LIEBER:  Yes.

23         MS. SCOTT:  I haven't looked at it yet; are they not

24  from Pittsburgh?

25         MR. LORENCE:  Is he on your witness list?

11:59:14AM 1        THE COURT:  No, he's on your voir dire list.

2        MR. LORENCE:  Okay.

3        THE COURT:  But I didn't do it because I didn't see

4   any connection other than the newspaper article.  At what point

5   is a public witness credibility, agency question, I'll raise

6   that right now; swearing and the agency question.

7        MR. LIEBER:  Some of these people are in unions.

8        THE COURT:  I saw that, struck that.  Thank you

9   though.  Preserved.

10        MR. LORENCE:  One final question.  We had something in

11   there about their reactions to big verdicts, do you have a

12   problem with big verdicts.

13        THE COURT:  Here's my thinking —

14        MR. LORENCE:  Do you think there's frivolous

15   lawsuits — there aren't too many lawsuits.

16        THE COURT:  I struck that.  Here's the other problem

17   you have.  They're not going to get that question.  I do front

18   and back pay.  They're only getting medical distress, which is

19   why I asked the emotional distress question.  I don't want to

20   mislead them thinking they're going to come back after the

21   talks and going to get that in their head.

22        They're going to talk about emotional distress.  You

23   make that argument, put it in their head now, it starts it the

24   wrong way.  I'm the one that does the wages.

25        MR. LORENCE:  But — well — but what if people have a

12:00:21PM 1    problem with, you know — here's the point I'm getting at,

2    Judge, respectfully.  Some people tend to think that if you

3    have a physical injury, a broken bone, that deserves more money

4    because emotional distress, they're faking.  And what my own

5    personal opinion is?  Emotional scars last a lot longer than a

6    broken bone, so that —

7            THE COURT:  The way I handle — that's a great point.

8    The way I handle that — the objection is denied.  The way I

9    handle that is I give a very specific jury instruction at the

10   end that you've all seen, Third Circuit, that emotional stress

11   is every bit as serious as physical distress.

12           MR. LORENCE:  I did see that.  Thank you, Judge.

13           THE COURT:  Anything else?

14           I do the public agency and the public employee.

15           MS. SCOTT:  We have no particular ones, but with

16   regard to the people that may be —

17           THE COURT:  Yes.

18           MS. SCOTT:  — are there — how — we'll have

19   specific —

20           THE COURT:  We'll call them up.  We'll come back

21   here — I'll ask the two questions and come back here and say:

22   Would you like to call somebody?  And then you tell me what

23   question I asked and I'm going to let you ask that question.

24           Okay?  So, for instance, I say:  County —

25           MS. SCOTT:  And you start with Plaintiff or —

12:01:25PM 1          THE COURT:  I just say:  Anybody have a problem with

2    one?

3          MS. SCOTT:  We say that in front of everybody?

4          THE COURT:  No, over here.

5          MS. SCOTT:  Oh, we come back up here.  I didn't

6    understand that.

7          THE COURT:  So I call you up here and say -- now,

8    you're not calling people up who haven't raised their hand.

9          MS. SCOTT:  I understand.

10          MR. LORENCE:  We'd like to.

11          THE COURT:  I know you'd like to.  That's fine.  The

12    objection is noted.

13          MR. LORENCE:  Thank you, Judge.

14          THE COURT:  But you can -- anybody that raised their

15    hand, you can go to a followup question.

16          MS. SCOTT:  Understood.

17          THE COURT:  I turn to the Plaintiff first:  What's the

18    first one you want to call up?

19          The first one is 12.

20          I'll turn to you:  Anything before 12 you want to talk

21    to?

22          MS. SCOTT:  Okay.  I get it.

23          THE COURT:  Let me just ask first the swearing

24    question and the public question.

25          MS. SCOTT:  And then we come back here.

12:02:00PM 1      THE COURT:  If you want to stay here, you can.  If you

2      want to take notes here, I don't mind.  Whatever you like to

3      do.  If you want to stay with your clients, that's fine.  It

4      will only be two minutes.

5           MS. SCOTT:  Understood.  Thank you.

6       (In open court.)

7           THE COURT:  Ladies and gentlemen, two questions that I

8      should have asked and I'd like to follow up with.  First is

9      this case involves some indelicate language.  I'm being really

10      kind there.  There's some really rough language that goes on

11      between people in a workplace environment and you're going to

12      see that type of language.  It's not — also it's not some

13      language that you may see on your corner; it's indelicate

14      language.

15           Does anybody have a problem listening to evidence that

16      includes language that is of the most indelicate nature?  Curse

17      words, swearing, swearing from men to women, women — you know,

18      women to men, back and forth, just cursing in the environment

19      of the work environment.  Does anybody have a problem that

20      would make it impossible to be fair and impartial simply

21      because you see those words?

22           Okay.  Second question is you heard the medical

23      examiner's in this case, right?  It's a public agency.  You may

24      see people who are involved in the public life.  For example,

25      you may see some pieces of paper that involve a gentleman by

12:03:46PM 1   the name of Rich Fitzgerald who is a County Executive of

2   Allegheny County.

3        He's not a party to this case, but his name may be in

4   play.  You may hear testimony from witnesses who are public

5   officials in Allegheny County or elsewhere.  I have one

6   question, one follow-up question about it.  Does anybody here

7   have any problem being fair and impartial knowing that -- not

8   me telling you -- that maybe one or more witnesses and there

9   may be some documents that involve public officials?  Either

10   way.

11        That is I don't want you to either give them deference

12   because they're public officials or disregard them because

13   they're public officials.  Can anybody -- can everybody here be

14   fair and impartial just because they're a public official?

15        And that goes to the next question.  Just because

16   you're a public official doesn't mean you give any more weight

17   to their testimony than not -- or less weight than not.  Okay?

18   Just because they have a public job doesn't mean they're

19   telling the truth more likely than someone else who doesn't

20   have a public job.  Is there anyone here that could not --

21   would not be able to follow that instruction?

22        Okay.  Thank you, ladies and gentlemen.

23        I'm going to take counsel to side bar for a moment and

24   invite some people up to talk on some particular questions.

25   Thank you.

12:05:11PM 1     (At side bar.)

2        THE COURT:  So first for the Plaintiff who is the

3  first person you'd like to call up and on what issue?

4        MR. LIEBER:  Judge, we do want — I guess it's just

5  the — I would just go with the — I mean 2, 11, 13 and 23

6  would be people — they were involved in some sort of gender in

7  the workplace.

8        THE COURT:  We're doing it seriatim.  Two on what

9  issue?

10        MR. LORENCE:  Gender, they were involved in some

11  gender —

12        MS. SCOTT:  Internal workplace investigation.

13        THE COURT:  All right.  Do you have any problem?  Do

14  you have a question?  Probably did not raise their hand.

15        MS. SCOTT:  No, I have the same issue with regard to

16  Juror 2.

17        THE COURT:  Okay.  All right.  Any other question for

18  Juror 2?

19        MS. SCOTT:  That was the only hand raising.

20        THE COURT:  Did you have other questions for Juror No.

21  2 concerning a response to a question?

22        MR. LORENCE:  Do I have any questions?

23        THE COURT:  No, do you want me to ask concerning a

24  response to a question?

25        MR. LORENCE:  Oh.

12:06:34PM 1             MR. HUBER:  No, that was our only --

2               THE COURT:  That was the only thing, wasn't it,    No.

3       2?

4               MR. LORENCE:  Well, I'd like to ask him what it was

5       about.

6               THE COURT:  I'm going to do that.

7               MR. LORENCE:  Oh, okay.

8               MS. YOST, DEPUTY CLERK:  Juror 2.

9               MR. LORENCE:  I'm sorry.

10              THE COURT:  I have a job here; I'll do it.

11              MR. LORENCE:  Could I put one other point on the

12      record, Judge?  Take 30 seconds.

13              THE COURT:  Not now she's coming up.  Wait until she's

14      done.

15              MR. LORENCE:  I can wait.  Thank you very much, Judge.

16              THE COURT:  Glad to.

17              MR. LORENCE:  I appreciate it.

18         (Juror approaches.)

19              THE COURT:  Hi, ma'am.  Thank you for being here.

20              JUROR NO. 2:  Sure thing.

21              THE COURT:  Very nice; why don't you step back a

22      second so the lawyers can hear you.

23              JUROR NO. 2:  Okay.

24              THE COURT:  You had raised your hand in response to a

25      question I had asked about some background you may have with a

12:07:16PM 1    gender-based issue.  What was the nature of that?

2                    JUROR NO. 2:  At my former employer — should I say

3      who it was?

4                    THE COURT:  Sure.

5                    JUROR NO. 2:  BNY Mellon.  I was involved in a

6      Human Resources investigation, a gentleman that was making

7      women in the workplace uncomfortable.

8                    THE COURT:  Okay.

9                    JUROR NO. 2:  Particularly talking to them in ways

10     that they felt demeaned.  There was a lot of staring at women's

11     chests instead of their eyes when he would talk.  And I had a

12     little bit of that experience with him but didn't notice as

13     much as the women that had brought the complaint, but I did

14     testify with HR to that effect.

15                   THE COURT:  Okay.  So you were sort of a witness in a

16     HR proceeding.

17                   JUROR NO. 2:  Right, just an HR proceeding.

18                   THE COURT:  Did you have any kind of retaliation —

19     anything happen to you at work because of that?

20                   JUROR NO. 2:  Nothing, no.  And he was — he was sort

21     of dismissed.  He was working from home for quite a while and

22     then just came back and nothing further.

23                   THE COURT:  Was he your superior?

24                   JUROR NO. 2:  He was not my superior, but he was in a

25     position of leadership in the department.

12:08:18PM 1        THE COURT:  Okay.  Is there anything about that

2  experience that would affect your ability to be fair and

3  impartial to both the Plaintiff here who is making somewhat —

4  making an allegation of sexual harassment and retaliation and

5  the County who is saying it didn't happen?

6        JUROR NO. 2:  I don't think so because I don't think

7  you can paint everybody with that same brush.

8        THE COURT:  Okay.  Let me turn to the lawyers, request

9  if they have a follow-up question.

10        MR. LORENCE:  Good morning.

11        JUROR NO. 2:  Good morning.

12        MR. LORENCE:  Thank you for coming here.

13        JUROR NO. 2:  Sure.

14        MR. LORENCE:  I wasn't sure if you were the one that

15  made the complaint.

16        JUROR NO. 2:  No.

17        MR. LORENCE:  Or you investigated it.

18        JUROR NO. 2:  I was asked to — I guess the women

19  who — the women who had made the complaint asked me to be a

20  witness with our Human Resources Department, just to say what I

21  had observed.  Not even to — you know, sort of — I hate to

22  use the word testify, it's not a legal proceeding, but on their

23  behalf, but asked me to please echo — you know, weigh in with

24  what I had observed.

25        MR. LORENCE:  What was — what was the outcome of the

12:09:19PM 1   investigation?

2        JUROR NO. 2:  He stayed in his position.  He worked

3   from home for a while and was less present at the office, and

4   then it seemed to go away.  He came back.  I think he tried to

5   be more sensitive to the issues people complained about.  He

6   has since retired, so —

7        THE COURT:  Are you still at BNY?

8        JUROR NO. 2:  I'm no longer at that company, no.  I

9   didn't leave for that reason.

10        THE COURT:  A real quick one; one more.

11        MR. LORENCE:  How did you feel about the outcome?

12        JUROR NO. 2:  I felt it was disappointing that he —

13   it seemed — it didn't feel like the complaint was taken

14   seriously enough to me.

15        MR. LORENCE:  Thank you thank you very much.

16        THE COURT:  Counsel, any question?

17        MS. SCOTT:  I would.

18        Ma'am.

19        JUROR NO. 2:  Sure, hi.

20        MS. SCOTT:  Hi.  So what did you — you've mentioned

21   now that you felt disappointed.  Were you disappointed in the

22   way that — how were you disappointed?  In terms of how the

23   employer handled it or Human Resources or — where did you come

24   up with that?

25        JUROR NO. 2:  I was disappointed in that I felt — I

12:10:24PM 1  felt that enough people had complained about the same thing

2  that it perhaps should have -- I don't know what I expected the

3  outcome would be.  But I don't think I expected him to stay in

4  the department in a position of power.  I think maybe the

5  position of power thing was my concern because he was in a

6  position to -- you know, he was in a position to make women

7  feel slighted because -- because of his role.

8          MS. SCOTT:  Yeah.  Okay.  Thank you.

9          THE COURT:  Thank you.  Anything else for the County?

10          MS. SCOTT:  No.

11          THE COURT:  Okay.  Thank you, ma'am.

12          JUROR NO. 2:  That's all you have for me?

13          Thank you.

14          THE COURT:  Thank you very much.

15      (Juror returns to seat.)

16          MR. LORENCE:  May I put one quick objection on the

17  record?  This is what I was getting at earlier -- this is

18  Michael Lorence.  The problem I have with yes/no questions is

19  that --

20          MS. SCOTT:  I'm sorry, the what questions?

21          MR. LORENCE:  The problem I have with limiting voir

22  dire to yes/no questions is, for example, with this witness the

23  question was do you think that you could be fair in making your

24  decision?  And the problem I have with it, respectfully,

25  Your Honor, is that cognitive science tells us now, for

12:11:34PM 1  example, that 90 percent of the —— 97 percent of the cognitive

2  activity going on in our brains right now as we talk is below

3  the surface of awareness.  A good book on it is Philosophy in

4  the Flesh by a neuroscientist and philosopher.

5      So consequently —— if I'm going too fast —— so

6  consequently we don't always know our own minds.  The only way

7  we really know what we think is when people ask open-ended

8  questions and we just start telling little stories that

9  happened.  Then the spontaneity and so on comes in.

10      So that's my objection.  I thank you very much for

11  letting me put it on the record.

12      THE COURT:  Of course, of course.  The objection is

13  overruled.

14      MS. SCOTT:  I would argue —— what do we about this,

15  strikes for cause?

16      THE COURT:  We do that after we finish the numbers.

17      MS. SCOTT:  Okay.

18      THE COURT:  We do that after we finish the numbers.

19      Who is the next one?

20      MR. LORENCE:  I think it's No. 11.

21      THE COURT:  Do you have something for 11?

22      MR. LORENCE:  If we're doing sequentially, I put down

23  8 for experts, psychology.

24      MR. LIEBER:  Oh, that's right.  I forgot.

25      MS. SCOTT:  Where did I miss that?  Oh, yes, any

12:12:39PM 1    medical training —

2          THE COURT:  Oh, yeah, yeah, yeah.

3          MR. LORENCE:  I called them experts.  I don't want

4    experts on the case — 8.

5          THE COURT:  Okay.  Eight, that's right.

6          MS. YOST, DEPUTY CLERK:  Would Juror No. 8 please come

7    forward.

8      (Juror comes to side bar.)

9          THE COURT:  Thank you, sir.  Thank you for being here

10    today.  Come on.

11          You had answered yes to a question I asked about some

12    experience you would have in understanding the medical

13    emotional distress issues, PTSD and those issues.

14          JUROR NO. 8:  I'm a teacher and just did some training

15    on it.  I thought the question was kind of vague and I didn't

16    know —

17          THE COURT:  Third answer.

18          JUROR NO. 8:  — how to answer it.

19          THE COURT:  What kind of training did you have, sir?

20          JUROR NO. 8:  Just kids and their emotional distress

21    or signs they may, you know, have stress in some way or

22    another.  Not necessarily PTSD, for example, but just — that's

23    what I mean, the question was vague and I didn't know to put up

24    or not, so I decided to err on the side of caution.

25          THE COURT:  Have you had any experience in counseling

12:13:38PM 1   children if you think they have emotional distress issues?

2          JUROR NO. 8:  Yeah, I mean —— not if they have —— you

3   know, a lot of times it might be kicked up to somebody like a

4   guy whose department, you know what I mean.  You know, usually

5   one of the first line in the school is dealing with that and

6   then passing it on to somebody more qualified than I.

7          THE COURT:  So you're not professionally trained in

8   any way.

9          JUROR NO. 8:  No, just classes based on within our

10  setting at work, to handle certain situations.

11         THE COURT:  If you see it, you don't diagnose or

12  anything like that.

13         JUROR NO. 8:  No, no.

14         THE COURT:  Okay.

15         Question from the Plaintiff?

16         MR. LORENCE:  You're a teacher, what is it that you

17  teach?

18         JUROR NO. 8:  Secondary history, political science,

19  government.

20         MR. LORENCE:  May I ask a follow-up?

21         Where do you teach, what school?

22         JUROR NO. 8:  Southmoreland School District.

23         MS. SCOTT:  I'm sorry?  Southmoreland ——

24         JUROR NO. 8:  Southmoreland; it's 40 minutes south.

25         THE COURT:  Anything further from the Plaintiff?

12:14:27PM 1          MR. LORENCE:  No.

2          THE COURT:  County?

3          MS. SCOTT:  I guess I wondered — I was thinking —

4     hello.  With regard to secondary education, what is that?  High

5     school?

6          JUROR NO. 8:  Yeah, high school; yeah, 9 through 12.

7     I pretty much teach ten and then an elective of 10th through

8     12th graders.

9          MS. SCOTT:  Okay.  So what — have you had any

10    training through the school about how to identify it, to report

11    it to someone else, to kick it up?

12         JUROR NO. 8:  I guess that would be like we were

13    trained to identify any sort of situations where kids could be

14    distressed or something like that; and we would then — well,

15    by law if we knew for sure we would have to report that legally

16    now.  But if it was skeptical, then kick it up, yes.

17         MS. SCOTT:  Okay.  Thank you.

18         MR. LIEBER:  So you're a mandatory reporter.

19         JUROR NO. 8:  Yes.  Yeah.

20         THE COURT:  Go ahead.

21         MR. LORENCE:  One final question.  When you see that

22    kind of distress on some the kids, what impact does that

23    have on you?  How does that make you feel when you see that?

24         JUROR NO. 8:  To be honest, I haven't seen it in a

25    lot — some time.  I mean, you know, depending upon what the

12:15:28PM 1  situation is sometimes, you know, somebody might need someone

2  to talk to, maybe it's a divorce situation or something like

3  that.  Other times — I've never really seen a hard case of

4  abuse or anything like that.

5         MR. LORENCE:  I didn't mean abuse.  Just where you saw

6  a child who seemed to be upset about divorce or something, can

7  you remember one that you had and the impact it had on you and

8  how you felt?

9         JUROR NO. 8:  Yeah, there was actually — there was a

10  kid who really — didn't like women, you know.  He — mom and

11  dad, you know — and he had all female teachers and I was one

12  of the few males in the school; and, you know, kind of tried to

13  help him through the time.  But that was just — that was,

14  geez, almost ten years ago.  That was in my first couple years.

15         THE COURT:  Thank you, sir.

16         MR. LORENCE:  Thank you.

17         THE COURT:  Thank you for your service.

18         MS. SCOTT:  Thank you very much.

19     (Juror returns to his seat.)

20         THE COURT:  No. 11?

21         MR. LIEBER:  I think it's No. 10.

22         MR. LORENCE:  Ten is the same issue, psychological.

23         MS. SCOTT:  I have ten as well.  I don't have nine.

24         THE COURT:  What is the concern with ten?

25         MS. SCOTT:  The same thing about medical training,

12:16:25PM 1    PTSD.

2              THE COURT:  Okay.

3          (Juror approaches.)

4              THE COURT:  Hello, sir.

5              JUROR NO. 10:  Hi.

6              THE COURT:  Thank you for being here today.

7          You had answered yes to my question about any training

8    or experience you may have dealing with emotional distress

9    issues.

10             JUROR NO. 10:  Yes, that was also for family members,

11   right?

12             THE COURT:  Yes, it was.

13             JUROR NO. 10:  Yeah, it's nothing that I can

14   guarantee.  My wife is a registered nurse, so in the course of

15   her duties she may have some experience with that.  Nothing

16   formal.  She's never been on a psych ward or anything like

17   that.

18             THE COURT:  Has she ever talked to you about treating

19   people with emotional distress issues or PTSD issues?

20             JUROR NO. 10:  No, sir.

21             THE COURT:  You said your wife's a registered nurse?

22   Where does she work?

23             JUROR NO. 10:  She works at UMPC Presbyterian.

24             THE COURT:  Okay.  Here in the city?

25             JUROR NO. 10:  Yes.

12:17:19PM 1        THE COURT:  And do you personally have any background

2   or experience in those types of issues?

3        JUROR NO. 10:  No, sir.

4        THE COURT:  Okay.

5        Plaintiff?

6        MR. LORENCE:  Just what department does your wife work

7   in in the hospital?

8        JUROR NO. 10:  She is currently on the IV team, so she

9   goes around and does IVs and central lines.

10        MS. SCOTT:  IV?

11        JUROR NO. 10:  Yes.

12        MS. SCOTT:  IV, thank you.

13        MR. LORENCE:  Thanks.

14        THE COURT:  Anything for the County?

15        MS. SCOTT:  We don't have.  Thank you very much.

16        THE COURT:  Thank you very much, sir.  Thank you for

17   being here.

18     (Juror returns to his seat.)

19        THE COURT:  Okay.  Ten —— next for Plaintiff?

20        MR. LIEBER:  Eleven.

21        THE COURT:  What is 11's issue?

22        MR. LORENCE:  Eleven is ——

23        MS. SCOTT:  —— involved in an internal workplace

24   investigation and also emotional harm.

25        MR. LORENCE:  Eleven is she was involved in a gender

12:18:02PM 1  issue and she sued someone over -- we don't know what the suit

2  was about.

3          THE COURT:  Okay.

4          MS. YOST, DEPUTY CLERK:  No. 11, please come forward.

5     (Juror approaches side bar.)

6          THE COURT:  Hi, ma'am.  How are you?

7          JUROR NO. 11:  Good.

8          THE COURT:  Come on in, please.  You had answered my

9  question about some experience you may have had in two

10  different areas.  One was some gender-based or workplace-based

11  harm and the second was have you sued or been sued in

12  connection with a personal injury.

13          Let's first deal with the employment one.  What was

14  that about?

15          JUROR NO. 11:  I was the shop steward at the company I

16  worked for.

17          THE COURT:  What company was that?

18          JUROR NO. 11:  It was called Pameco; it was in

19  California.

20          THE COURT:  Okay.

21          MS. SCOTT:  Pardon me?

22          JUROR NO. 11:  Pameco, P-A-M-E-C-O.  I don't even

23  think it's in business anymore.

24          THE COURT:  In California.

25          JUROR NO. 11:  In California, San Francisco.  And so I

12:19:04PM 1    went to a lot of things, you know, because an employee would

2    come to me and I would have to -- go, I was like the go to

3    person.

4              MR. LORENCE:  Uh-huh.

5              THE COURT:  Yes.

6              JUROR NO. 11:  And we'd win some, we lost some.

7              THE COURT:  So you went to HR-type hearings.

8              JUROR NO. 11:  Yeah.

9              THE COURT:  Not to courtrooms.

10            JUROR NO. 11:  Well, not to courtrooms.  I did have to

11    go to one courtroom when they fired an employee and we had to

12    go try to get the job back.

13            THE COURT:  Did any of those issues involve gender

14    discrimination, harassment, retaliation?

15            JUROR NO. 11:  Well, the employee that got fired had a

16    baby, and they fired her because she took too long to come

17    back.  So that would only happen to a woman, so I didn't know

18    if that was a gender or not.

19            THE COURT:  Okay.  Was there any -- how long ago was

20    that, ma'am?

21            JUROR NO. 11:  Oh, 25 years.

22            THE COURT:  Okay.  In the last -- since you've been

23    here in Pittsburgh over the last five, ten years have you had

24    any of those type of issues?

25            JUROR NO. 11:  No.

12:19:58PM 1     THE COURT:  Okay.  The second question we asked you

2 was concerning you being a party or being involved in a

3 personal suit that resulted in personal injury.  Tell me about

4 that one.

5     JUROR NO. 11:  I stepped in a hole.

6     THE COURT:  Okay.

7     JUROR NO. 11:  And I had to have my foot

8 reconstructed.

9     THE COURT:  Serious injury.

10     JUROR NO. 11:  Yeah, and the company —— I had to sue

11 them —— technically you can't sue your employer in

12 Pennsylvania.

13     THE COURT:  It was your employer, so you had to go for

14 your Workmen's Comp then.

15     JUROR NO. 11:  Yeah.

16     THE COURT:  That's the only reason you had the

17 Workmen's Comp, that's what you were talking about.

18     JUROR NO. 11:  Yeah.  That's why I said I raised my

19 hand, but I wasn't sure whether it was ——

20     THE COURT:  That's right, that's the right answer.

21     JUROR NO. 11:  But I wanted to be honest.

22     THE COURT:  When was that?

23     JUROR NO. 11:  That was just —— ten years ago.

24     THE COURT:  Okay.  Did that resolve eventually?

25     JUROR NO. 11:  Yeah.

12:20:34PM 1        THE COURT:  Did you have —— what was your feelings

2    about the system because of it?  Now this is a different

3    system, it isn't Worker's Comp; but what do you feel about the

4    system?

5        JUROR NO. 11:  I just —— I mean I realize the company

6    didn't want to pay if they didn't have to, but it was pretty

7    cut and dried to me and they were delaying it.

8        THE COURT:  Taking a long time.

9        JUROR NO. 11:  Yes, two years.

10       THE COURT:  Okay.  And is that —— so that experience,

11   one is as an employee/manager type in California and the second

12   is a slip and fall into a hole; and any other experiences you

13   can think of?

14       JUROR NO. 11:  Not really.

15       THE COURT:  Going back to the one in California, did

16   you have any experience in running workplace investigations?

17       JUROR NO. 11:  Yeah, I did have to sort of check them.

18   I mean I had to kind of verify that the person, you know, had a

19   reason to go to the union and the union had to fight.

20       THE COURT:  Were you interviewing people, that kind of

21   thing?

22       JUROR NO. 11:  Sort of, yeah.

23       THE COURT:  Okay.  How many times do you think that

24   occurred while you were there?

25       JUROR NO. 11:  Oh, gosh.  I was that for like fifteen

12:21:31PM 1    years, so a long time.

2              THE COURT:  Okay.

3              Plaintiff?

4              MR. LORENCE:  Are you from California?

5              JUROR NO. 11:  San Francisco, yes.

6              MR. LORENCE:  You are.  Why did you leave California

7    and come to Pittsburgh?

8              THE COURT:  Don't answer that question.

9              JUROR NO. 11:  Okay.

10             THE COURT:  That has nothing to do with the case.

11             MR. LIEBER:  If I may, what type of business was

12   Pameco?

13             JUROR NO. 11:  It was an air conditioning and heating

14   company.

15             MR. LIEBER:  Thank you.

16             JUROR NO. 11:  Wholesale.

17             THE COURT:  Anything further from the Plaintiff?

18             MR. LIEBER:  No.  Thank you.

19             JUROR NO. 11:  Am I good?

20             MS. SCOTT:  No —

21             THE COURT:  No, I'm sorry.

22             JUROR NO. 11:  I'm sorry.

23             MS. SCOTT:  That's okay.

24             THE COURT:  You're doing fine.

25             MS. SCOTT:  So in this case, this former employee was

12:22:04PM 1    in a union with the County.  And there are issues about her

2    claims about grievances and union representation and then

3    claiming about management, who is the Defendant in this case.

4           So what are your feelings about matters involving

5    union employees that are making complaints either in grievances

6    or in workplace matters about employers?

7           JUROR NO. 11:  I think I would try to be very fair,

8    but I think part of me would probably be fairer to the union

9    person if you want my honest opinion.

10           THE COURT:  The union member; that was your honest

11    opinion, yes?

12           JUROR NO. 11:  (Nods head.)

13           THE COURT:  Okay.

14           MR. LIEBER:  Could you be fair?

15           THE COURT:  Hold on one second.

16           JUROR NO. 11:  I could be very fair.

17           MS. SCOTT:  Well, I don't —

18           THE COURT:  Any follow-up?

19           MS. SCOTT:  I do.  You said you would try to be fair.

20           JUROR NO. 11:  And I think I could be very fair.

21           MS. SCOTT:  I understand, and we would certainly hope

22    that; but you've already explained that you believe you would

23    be fairer to the union people.  Is that what you had said?  Did

24    I hear that accurately?

25           JUROR NO. 11:  I don't know if I'd be fairer to her,

12:23:16PM 1    to the union people.  But I would —

2          THE COURT:  I understand.  Your background is — it's

3    where your background is.

4          JUROR NO. 11:  Yeah, my background is union.  My

5    pension comes from a union; does it make a difference?

6          MS. SCOTT:  I'm sorry?

7          THE COURT:  Her pension comes from a union.

8          JUROR NO. 11:  My pension comes from the union.

9          MS. SCOTT:  Okay.

10          THE COURT:  You may follow up.

11          MR. LIEBER:  So just to clarify, so your initial

12    sympathies might be with the union, but do you —

13          MS. SCOTT:  Are we asking leading questions?

14          THE COURT:  Sir — quiet.  Just ask the question.

15    It's not a time to go back and forth you two.

16          All right.

17          MR. LORENCE:  I'm sorry, am I allowed to ask the

18    question?

19          THE COURT:  Yes, ask the question but not — I'll ask

20    the question.  The fact that you — your sympathies when you

21    start may be with her, would you be a able to adopt and listen

22    to the evidence and make a fair decision based on the evidence?

23          JUROR NO. 11:  I think so, yes.

24          MR. LORENCE:  Thank you, that's all I have.

25          THE COURT:  Anything further from the Defendant?

12:24:02PM 1           MS. SCOTT:  No.

2           THE COURT:  Thank you very much, ma'am.

3           JUROR NO. 11:  You're welcome.

4       (Juror returns to her seat.)

5           MS. SCOTT:  Your Honor, if we're going to be asking

6 questions, can I ask that counsel not ask leading questions?

7           THE COURT:  Yes, I'll take over.  Tell me that and

8 I'll do it.

9           MR. LIEBER:  Judge, we have a — let's see, number —

10 that was — was that 13?

11           MS. YOST, DEPUTY CLERK:  That was 11.

12           MR. LORENCE:  Thirteen is on the gender issue.

13           MR. LIEBER:  Thirteen answered yes to the gender issue

14 and/or workplace investigation.

15           THE COURT:  Okay.

16           Do you have any other before 13?

17           MS. SCOTT:  We were at 11.  So 12 — no, Your Honor.

18           THE COURT:  Okay.  Thirteen, thanks.

19           MS. YOST, DEPUTY CLERK:  No. 13, please come forward.

20       (Juror approaches.)

21           THE COURT:  Thanks for being here.  Thank you for

22 coming in, sir.

23           You had answered my question about some experience you

24 may have in workplace investigations.

25           JUROR NO. 13:  Yes.

12:25:06PM  1            THE COURT:  I don't know if it was gender-based or

2    not, but would you tell me about that?

3            JUROR NO. 13:  Yeah, I worked in the gas industry in

4    admin that turned probably 14 or 15 of us in for harassment to

5    try and say that we were trying to get her fired.

6            THE COURT:  Okay.  And when was this, sir.

7            JUROR NO. 13:  Probably two years ago.

8            THE COURT:  Okay.  What happened as a result of that

9    claim?

10            JUROR NO. 13:  She actually quit and HR came in and

11    interviewed us and —

12            THE COURT:  I was going to ask you; so HR interviewed

13    you.

14            JUROR NO. 13:  Yes.

15            THE COURT:  Anything — did you receive any penalty

16    from that?

17            JUROR NO. 13:  No, no.

18            THE COURT:  Was there any other charge brought by any

19    other woman?

20            JUROR NO. 13:  No.

21            THE COURT:  Okay.  And you're still with that

22    employer?

23            JUROR NO. 13:  I was until they moved out of town.

24    I'm unemployed now.

25            THE COURT:  Okay.  And that — did that experience

12:25:57PM 1  result to you in any kind of loss of time at work or money

2  because you had to go through an interview process?

3          JUROR NO. 13:  No, no.  They did it all on company

4  time.

5          THE COURT:  This case has to do with somebody making

6  accusations of sexual harassment and retaliation, a hostile

7  work environment.  The fact that you were subject to somebody

8  making that claim, would that in any way influence your duty to

9  be fair and impartial?

10          JUROR NO. 13:  I mean -- I -- like on my experience

11  with my situation, that was just an excuse she used because she

12  couldn't do her job.

13          THE COURT:  Okay.

14          JUROR NO. 13:  So that's --

15          THE COURT:  Okay.  Have you had any involvement, any

16  other claims by any other woman?

17          JUROR NO. 13:  No, no.

18          THE COURT:  You know what I mean, like not in any

19  other job or something.

20          JUROR NO. 13:  No, no, that was it.

21          THE COURT:  Plaintiff?

22          MR. LORENCE:  Hi.

23          JUROR NO. 13:  Hello.

24          MR. LORENCE:  Could you tell me what were the nature

25  of the complaints by these women?  Were they --

12:26:51PM  1    THE COURT:  That's enough.

2    MR. LORENCE:  Tell us more about that.

3    JUROR NO. 13:  She said we used profanity in front of

4 her, that somebody was supposedly messing with her keyboard on

5 her computer.  And I mean most of the time it was just she got

6 all flustered and didn't know — because we hired her as admin

7 to take calls and just basically transfer the phones to our

8 offices.  And like she was there for three months and couldn't

9 get the job accomplished.  Like she — three months you should

10 at least know how to shut an office, whose office is what.  And

11 every time, you know, we'd transfer a call back there and she'd

12 get nasty with us.  And so like — and naturally you're going

13 to give a little bit of attitude back.  And that's basically

14 all that ever came out of it.  I mean she just — it came down

15 to like we were just trying to get the point across.  I mean we

16 were a multi million dollar business trying to run with a

17 skeleton crew.  I mean it's just — you know, you get

18 frustrated.

19    MR. LORENCE:  I get it.  Thank you.

20    THE COURT:  County?

21    MS. SCOTT:  Yes.

22 Good morning.

23    JUROR NO. 13:  Good morning.

24    MS. SCOTT:  In this experience that you had, how did

25 you feel you were being treated by your co-workers and by

12:28:10PM 1   management?

2         JUROR NO. 13:  They did great on handling that.  I

3   mean they — like even the HR Department, I mean they came in

4   and — you know, cut and dried everything and took care of it.

5         MS. SCOTT:  Thank you.

6         Can I have one more?

7         THE COURT:  Yes.

8         MS. SCOTT:  Another follow-up on that.  When you look

9   back on it today, how are your feelings about the entire

10   process that you had to go through, if you have any.

11         JUROR NO. 13:  I really don't.  I don't really.

12         MS. SCOTT:  Okay.  Thank you.

13         THE COURT:  Thank you, sir.  Thank you for being here.

14         MR. LORENCE:  Okay, thanks.

15     (Juror returns to his seat.)

16         THE COURT:  After 13?

17         MR. LORENCE:  That's 13.

18         MR. LIEBER:  I think the —

19         MR. LORENCE:  I got 23, 25 and 27.

20         THE COURT:  You won't get to that.

21         MR. LORENCE:  I know.

22         MS. SCOTT:  Thirteen —

23         MR. LIEBER:  Seventeen, worked for Allegheny County.

24         MS. SCOTT:  He actually didn't.  He thinks he does.

25   But he worked for the Port Authority, which is a separate

12:29:08PM 1    entity, it's like SEPTA.

2              THE COURT:  I'll ask him.  He'll be the last number I

3         get to.

4              MS. SCOTT:  I had —

5              THE COURT:  We're not going to get to 18.

6              MR. LIEBER:  We have 18 next —

7              MS. SCOTT:  There was sixteen — that was Medvid that

8         I think he raised his hand and said he knew him.

9              THE COURT:  What's the next one?

10             MS. SCOTT:  No. 20.

11             THE COURT:  Let's get 16 up here.

12             MS. YOST, DEPUTY CLERK:  No. 16, please come forward.

13          (Off the record discussion.)

14          (Juror approaches.)

15             THE COURT:  Hello, sir.

16             JUROR NO. 16:  Hello.

17             THE COURT:  You had mentioned you might know      Nick

18        Medvid.

19             JUROR NO. 16:  Yes.

20             THE COURT:  Does the gentleman you know work for the

21        Allegheny County Medical Examiner's Office do you know — how

22        do you know Nick Medvid?

23             JUROR NO. 16:  I grew up next-door to him.

24             THE COURT:  When was the last time you saw him?

25             JUROR NO. 16:  My parents still live on the same road

12:30:00PM 1    we grew up on so driving past I'll see him outside at his

2    parents' house playing with the kids.

3                THE COURT:  Playing with his kids.

4                JUROR NO. 16:  Yes.

5                THE COURT:  Okay.  Do you know what his job is?

6                JUROR NO. 16:  Presently, no.  I don't.

7                THE COURT:  Were you personal friends with him?

8                JUROR NO. 16:  Growing up, yeah, we used to play

9    together all the time.

10                THE COURT:  And where was this, sir, with him?

11                JUROR NO. 16:  At Peters Township.

12                THE COURT:  Peters Township, okay.  And — but you

13   don't know if this is the same Nick Medvid that works at the

14   Allegheny County —

15                JUROR NO. 16:  I'm pretty sure because he started out

16   in his earlier career when he was about — in Allegheny County

17                MS. SCOTT:  We know him.  If you would describe his

18   physical description, height —

19                JUROR NO. 16:  He's a little bit taller than me, a

20   little bit huskier — he's much huskier, he's got bad knees.

21                MS. SCOTT:  Facial —

22                JUROR NO. 16:  He's a huskier guy, let's just put it

23   that way.  His parents are Nick, Junior, and Elaine — or Nick,

24   Senior, and Elaine.

25                MS. SCOTT:  His wife's name, do you know that?

12:30:57PM 1          JUROR NO. 16:  I never met his wife.

2          THE COURT:  Okay.  Any follow-up on the identification

3    of the witness?  County?

4          MS. SCOTT:  Well, my — not on the identification, but

5    I didn't know if you have the other two questions about -- if

6    that would -- if he's going testify.

7          THE COURT:  Let me ask you this -- and I'll ask you

8    this:  Is he going to testify?

9          MS. SCOTT:  Yes.

10          THE COURT:  Apparently he and his wife are going to

11    testify, okay?  I don't know either one of them, what they're

12    going to testify.  Is the fact that you being on the jury and

13    he testify, would you give any more or less credibility because

14    you grew up with him as a kid and you knew him and had a good

15    relationship when you were a young man?

16          JUROR NO. 16:  I mean I grew up next-door to him.  I

17    mean I don't know how —

18          THE COURT:  He would recognize you?

19          JUROR NO. 16:  Oh, one hundred percent.

20          THE COURT:  Okay.

21          JUROR NO. 16:  Oh, yes.

22          THE COURT:  All right.  I've got enough.  Thank you,

23    sir.

24       (Juror returns to his seat.)

25          THE COURT:  That was numb what?

12:31:44PM 1    MS. SCOTT:  Eleven —— no.

2    THE COURT:  No, no.

3    MR. LIEBER:  Sixteen.

4    THE COURT:  Okay.  You had a question on 17, some

5 other question with 17?

6    MS. SCOTT:  He says he's an Allegheny County employee,

7 but he's not.  I don't really want to bring him up if he

8 doesn't know, but frankly I think that that makes a difference.

9    THE COURT:  The problem is if he thinks is.

10    MS. SCOTT:  I know.  Yeah, I agree.

11    THE COURT:  Let's get him up here.

12    MS. YOST, DEPUTY CLERK:  Seventeen, please come

13 forward.

14    MR. LORENCE:  What's the issue?

15    THE COURT:  He thinks he works for Allegheny County.

16    MR. LIEBER:  And he works for the Port Authority.

17    THE COURT:  He may or may not.  Twenty —— 20 said Port

18 Authority ——

19   (Off the record discussion.)

20   (Juror approaches.)

21    THE COURT:  Ma'am, I think we —— I may give you a

22 pass.  We thought you raised your hand yes to another question.

23    JUROR NO. 17:  To the County; I work for the County.

24    THE COURT:  You work for the County.  Presently?

25    JUROR NO. 17:  No, you said in the past.

12:32:37PM  1          THE COURT:  What did you do in the past, ma'am?

2          JUROR NO. 17:  I was a helper at the Allegheny Child

3  Welfare Shelter at — it was McIntyre Shelter in Ross Township,

4  which has since been torn down.

5          THE COURT:  How long ago was that?

6          JUROR NO. 17:  1974.

7          THE COURT:  Have you had any connection with the

8  County, as an employee or otherwise, other than taxpayer maybe

9  since then?

10         JUROR NO. 17:  No.  I did answer a question truthfully

11  about politicians and being able to render an objective

12  opinion.  I should say that I do know Rich Fitzgerald socially

13  in the sense that we're a member of the same parish, Catholic

14  parish; and one of his children is employed by my husband.  So

15  he —

16         THE COURT:  Okay.  I don't think Mr. Fitzgerald may

17  testify, but you may hear his name.

18         JUROR NO. 17:  Right, okay.

19         THE COURT:  Allegheny County, right?  You may hear his

20  name.

21         JUROR NO. 17:  Right, exactly, right.

22         THE COURT:  Any question about the experience in 1974?

23         MR. LIEBER:  No.  But if I may, Judge — may I ask

24  about — you said that one of Rick Fitzgerald's children is

25  employed by your husband?

12:33:38PM 1               JUROR NO. 17:  Yes.

2               MR. LIEBER:  Okay.  Can you tell us what that business

3  is?

4               JUROR NO. 17:  It's a non-profit Bridgeway Capital.

5               MR. LIEBER:  It's what?

6               JUROR NO. 17:  Bridgeway Capital.

7               MR. LIEBER:  And this is an adult child obviously.

8               JUROR NO. 17:  Correct.

9               MR. LIEBER:  And how old is he?

10              JUROR NO. 17:  Mid, late 20s.

11              MR. LIEBER:  How long has he worked there?

12              JUROR NO. 17:  Less than a year.

13              MR. LIEBER:  Okay.  Now, if — I guess the question,

14  Judge, is — I mean —

15              THE COURT:  Don't talk to me.

16              MR. LIEBER:  May I ask her?

17              THE COURT:  As long as it's not leading.

18              MR. LIEBER:  Based on — would you — if — you go to

19  the same parish as Rich Fitzgerald.

20              JUROR NO. 17:  Correct, and I see him at social

21  events.

22              MR. LIEBER:  And you see him and socialize with him

23  and you're — his son works in your family — in your husband's

24  business.

25              JUROR NO. 17:  It's a non-profit corporation.  It's

12:34:39PM 1   not a family business.

2          MR. LIEBER:  Right.  If you thought that he were

3   somehow identified with some side of this case, would you be

4   able to be impartial?

5          JUROR NO. 17:  I think so.  I just wanted to disclose

6   it because I thought later, after you asked the more general

7   question, that there was this employment.

8          THE COURT:  It's better to do it.  I very much

9   appreciate it.  You did the right thing.  Thank you very much.

10          MS. SCOTT:  Thank you.

11          MR. LORENCE:  Thank you.

12       (Juror returns to her seat.)

13          THE COURT:  So 20 is the guy who thinks he's

14   retired -- he's retired.

15          MR. LORENCE:  He is retired.

16          THE COURT:  No, he's retired.

17          MR. LORENCE:  Sometimes I think I'm retired.

18          THE COURT:  So we're not going to get to 20.

19          Okay.  So do we have motions for cause?  First from

20   the Plaintiff.

21          MR. LIEBER:  Yes.  Well --

22          MR. LORENCE:  Is it possible to take two or three

23   minutes and confer with co-counsel?

24          THE COURT:  Yes.

25          MR. LORENCE:  Thank you, Judge -- five?

12:35:36PM 1        THE COURT:  Two.  We'll stand here and wait for you.

2        MS. SCOTT:  Okay.

3        THE COURT:  You can go back to your desks and talk.

4    (Brief pause in proceedings.)

5    (At side bar.)

6        THE COURT:  Any motion for cause?

7        MR. LIEBER:  Number 16, Your Honor, he's the friend of

8  the witness.

9        THE COURT:  Mr. Medvid.  Any objection?

10       MS. SCOTT:  No, Your Honor.

11       THE COURT:  That's the one I have for cause; he knows

12  Mr. Medvid.

13       MR. LIEBER:  Number —

14       THE COURT:  We're also — so the record is clear,  No.

15  15, I believe, madam deputy, is the one who had the baby issue?

16       MS. YOST, DEPUTY CLERK:  Correct.

17       THE COURT:  So she would have been excused had she not

18  been here.

19       MS. YOST, DEPUTY CLERK:  Correct.

20       THE COURT:  So No. 15 has the cause, she shouldn't

21  have been here in the first place but she was late on her

22  excuse.

23       MR. LORENCE:  Seventeen is the woman —

24       MR. LIEBER:  No. 17, the one — I mean

25  Rich Fitzgerald is Allegheny County.  Allegheny County is

12:38:21PM 1    the -- the Defendant.  She's very close to him, both in terms

2    of their religious observance, they socialize together.  His

3    child works in their family enterprise, which is a

4    non-profit -- I think that would be the appearance of

5    impropriety if she serves.

6              THE COURT:  He's not coming in, is he?

7              MS. SCOTT:  He is not.

8              MR. LIEBER:  He's not come in, but he's identified

9    with some of the issues in case.

10             THE COURT:  So he's not identified -- he was not in

11   the pretrial statement.  The motion is denied.

12             MR. LIEBER:  Okay.  And then we're concerned also

13   about No. 37, the gentleman who was in the --

14             MR. HUBER:  Thirteen.

15             MR. LIEBER:  Juror 37.

16             THE COURT:  Any objection to 13?

17             MS. SCOTT:  Yes, we do, Your Honor.

18             THE COURT:  What's your objection to 13?

19             MS. SCOTT:  Well, on 13, what -- I don't understand

20   what the objection is.

21             THE COURT:  Okay, let's hear it again.

22             MR. LIEBER:  Okay.  Thirteen was --

23             MR. LORENCE:  Charged by a group of women.

24             MS. SCOTT:  I know what he said, but I don't know the

25   objection.

12:39:27PM 1          MR. LIEBER:  The objection is that it doesn't seem —

2    we can't be confident for our client that someone like this can

3    be impartial based on what he said.  He was involved in a

4    serious situation at work where a woman in his view falsely

5    claimed sexual harassment, involved him and other people, and

6    really because she couldn't do the work.

7          MR. LORENCE:  He suggested he thought he might have a

8    problem, too.

9          THE COURT:  Any challenge — I don't know if that

10   meets the standard.

11         MS. SCOTT:  I don't think it is the standard at all,

12   that there was nothing that was asked of him that went to his

13   ability to serve as a fair and impartial juror.  That wasn't

14   even brought up.

15         THE COURT:  He did.

16         MS. SCOTT:  Other than the fact that he said he could

17   be.

18         THE COURT:  Well, yes.  That's — he did answer that.

19   He said he could be.

20         MS. SCOTT:  And he never went to the contrary of that.

21   It wasn't even like he needed to be sort of rehabilitated.

22   It's was that he's got something in his past experience that we

23   have jurors all the time that have past experience.

24         THE COURT:  Let me old on that one.  Do you have any

25   others?

12:40:32PM 1      MR. LIEBER:  No, this would be cause.

2      THE COURT:  Whom does the County have?

3      MS. SCOTT:  We have two for cause.

4      THE COURT:  Okay.

5      MS. SCOTT:  And the first one was simply — and I

6  think that there is a similarity between this and the gentleman

7  that we were just dealing with except she ends up —

8      MR. LORENCE:  What's the number?

9      THE COURT:  No. 2.

10      MS. SCOTT:  She ends up with — she quoted herself as

11  saying at the end of her encounter she was disappointed that

12  the employer had not taken a complaint seriously.  But yet when

13  she described events, they were the events that the company

14  investigated.  They did interviews.  There was a lot of things

15  going on that would seem to be that the employer did its job

16  instead of having to anticipate in advance of —

17      THE COURT:  I got it.

18      MR. LORENCE:  I got this —

19      MS. SCOTT:  I should also add that she focused a lot

20  on the end about the — this was a man in power.  And that we

21  have four people here that that's — they are all a position of

22  power.

23      THE COURT:  Okay.

24      MR. LORENCE:  Well, I don't think that meets the

25  standard.  I think what she said was that after the

12:41:37PM 1    investigation -- I read her as saying that she -- that

2    impliedly thought that the facts of the investigation indicated

3    that more should have been done.  That doesn't mean that she

4    doesn't believe in objective, fair investigations.  I think she

5    could easily have -- if we could have talked with her maybe

6    some more, said:  Well, what if the facts led you to believe

7    that the person who filed it didn't have a case?  Then -- she

8    was disappointed in the outcome, and I think impliedly she

9    thought there were sufficient facts --

10            THE COURT:  Here's the ruling.  I'm going to rule on

11    both 2 and 13, strike both of them.  Their experience is

12    enough.  We have enough jurors who don't have any experience.

13    Their experience is enough for me in this context to meet the

14    standard.  They both lived through it, not that they heard

15    about it.  They both lived through a workplace investigation

16    that involved discrimination, one being an accused and the

17    other being a witness for a victim -- alleged victim, so it's

18    close enough they could come in with a colored view.  So both 2

19    and 13 are struck.

20            MS. SCOTT:  Along that same line, then, we would say

21    that the union steward is struck?

22            THE COURT:  No, I denied that.  I thought you were

23    going to say that -- well, let me ask; unless you agree.

24            MR. LORENCE:  No, of course not.

25            THE COURT:  The union steward's problem was it was

12:42:53PM 1    25 — several years ago, 25 years ago, in California, relating

2    to a whole panoply of particular issues.  She never said she

3    testified or provided — she did interviews.  I don't see any

4    correlation with this —

5         MS. SCOTT:  She did say she testified.

6         THE COURT:  No, no —

7         MS. SCOTT:  She said that — those would be like

8    arbitration hearings and things along that line; and she said

9    twice that she would be fair, but she would be fairer to the

10   union, which means that she's not following the legal standard.

11        THE COURT:  Except I asked the next question, right?

12   And I asked the question:  If you heard more evidence, would

13   you be — would you lose that slant?  And she said:  Yes, I

14   would.  So I deny your request.

15        What number was she?  I'm sorry.

16        MS. SCOTT:  She's 11.

17        THE COURT:  Eleven, yes.

18        Any others from the County?

19        MS. SCOTT:  No, Your Honor.

20        THE COURT:  Okay.  So, madam deputy, let's read back

21   who is out.  Two is out —

22        MS. YOST, DEPUTY CLERK:  No. 2 is out, No. 13 is out,

23   No. 15 is out.

24        MS. SCOTT:  I'm sorry —

25        MR. LORENCE:  What was the third one?

12:43:53PM 1          MS. YOST, DEPUTY CLERK:  Fifteen.

2          THE COURT:  Fifteen.

3          MS. YOST, DEPUTY CLERK:  And 16.

4          MR. LIEBER:  And your ruling on 17?  You were going to

5    rule on 17.

6          THE COURT:  I thought 17 — 17 is the same as 2, isn't

7    17 —

8          MS. SCOTT:  Seventeen is in.

9          MR. LIEBER:  I thought you were researching or

10   something on 17 —

11         THE COURT:  I overruled 17, that's right.

12         MS. YOST, DEPUTY CLERK:  I'm sorry, what?

13         THE COURT:  Seventeen is in.

14         MS. YOST, DEPUTY CLERK:  Okay.  With my list,

15   Your Honor, we're going to need to bring back No. 18 to get us

16   to our magic number.

17         THE COURT:  Okay.  Bring back 18.  What was the

18   concern on 18?

19         MS. YOST, DEPUTY CLERK:  Eighteen, please.

20         MS. SCOTT:  Said that they were sued for personal

21   harm — was there a fine to that one?

22      (Off the record discussion.)

23      (Juror approaches.)

24         THE COURT:  Thank you for being here.

25         JUROR NO. 18:  Sure, you're welcome.

12:44:48PM 1        THE COURT:  You had answered yes to my question

2    concerning some experience you might have had with a lawsuit or

3    somebody suing you for either personal injury, you suing for

4    personal injury?  I thought you said for family as well.

5        JUROR NO. 18:  Yes, I did.

6        THE COURT:  For now.  What was that?

7        JUROR NO. 18:  Just my father.  He had a compensation

8    case against the City of Pittsburgh.

9        THE COURT:  Okay.  He was a worker for Pittsburgh?

10       JUROR NO. 18:  Yeah, he worked for the city, Public

11    Works and stuff like that.

12       THE COURT:  Okay.  And what happened, he got injured

13    on the job?

14       JUROR NO. 18:  Yeah, ruptured three disks and they

15    didn't want to give him disability, so he had to go and fight

16    for it.

17       THE COURT:  Okay.  And what was your role in that, if

18    any?

19       JUROR NO. 18:  I was just the son, that it's.

20       THE COURT:  Okay; helpful to your dad.

21       JUROR NO. 18:  Yeah.

22       THE COURT:  And did you –– did that work out favorably

23    for your dad or do you have a bad feeling about it because your

24    dad had to wait to get paid?

25       JUROR NO. 18:  Yeah, because we were fighting it for

12:45:30PM 1    like from 2006 to about 2010, so it was four years; just no

2    income, just trying to get it back, you know.

3            THE COURT:  Okay.  And eventually it resolved.

4            JUROR NO. 18:  Yes.

5            THE COURT:  Okay.

6            JUROR NO. 18:  Eventually he won his case.

7            THE COURT:  Okay.  Is there anything about that

8    experience -- this is Allegheny County, not in Pittsburgh.

9            JUROR NO. 18:  Yeah.

10           THE COURT:  But is there anything about that case that

11   would have you view the County in a different way as the

12   employer as opposed to -- a public employer just like the city.

13           JUROR NO. 18:  Yeah, but not at all.

14           THE COURT:  Okay.  Is there anything about the fact

15   that your dad had to spend some time through the legal system

16   that would affect your ability to be fair and impartial in this

17   case?

18           JUROR NO. 18:  Well, that case -- yeah, just because

19   it took so long, you know, four years of no income whatsoever.

20           THE COURT:  Would it affect your ability to be fair

21   and impartial to these two parties?

22           JUROR NO. 18:  No, not in this case.

23           THE COURT:  Cases take time.

24           JUROR NO. 18:  Uh-huh.

25           THE COURT:  Okay?  It's not anybody -- it's just they

12:46:20PM 1    take time.

2                   JUROR NO. 18:  Yeah.

3                   THE COURT:  My question is because of that, because

4       these take time, would that affect your ability to either be

5       harmful to the County or favorable to the Plaintiff because it

6       took time to get here?

7                   JUROR NO. 18:  No, sir.

8                   THE COURT:  Plaintiff?

9                   MR. LIEBER:  No questions.

10                  THE COURT:  County?

11                  MS. SCOTT:  Hi.  I'm wondering what your feelings or

12      opinion is about the City of Pittsburgh at this point.

13                  JUROR NO. 18:  Just no problem at all anymore.  My

14      Dad's getting paid again, so we're good.

15                  MS. SCOTT:  Is he back to work?

16                  JUROR NO. 18:  No, he can never go back to work again.

17      He's permanently disabled now.

18                  MS. SCOTT:  Oh, I'm sorry.

19                  JUROR NO. 18:  He had to have three disks replaced in

20      his back.  He's permanently in a wheelchair from now on.

21                  MS. SCOTT:  Okay.

22                  THE COURT:  Are you okay?

23                  JUROR NO. 18:  Yeah.  My dog knocked me down the

24      steps, so I think that might have --

25                  MS. SCOTT:  What happened?

12:47:02PM 1            JUROR NO. 18:  My dog —— I got a big 90 pound German

2       Shepherd; he took me down the steps with him.

3            THE COURT:  Okay.  All right.  Anything further?

4            All right.

5            Thank you, sir; you may be seated.

6         (Juror returns to seat.)

7            THE COURT:  Okay.  Any concern with 18?

8            MR. LORENCE:  No.

9            MS. SCOTT:  No.

10           THE COURT:  Okay.  So 18 is in.

11           All right.  So madam deputy will give each of you the

12      sheets now.  We'll start with Plaintiff one, Defendants one,

13      Plaintiff two, Defendants two, Plaintiff three, Defendants

14      three, and we'll empanel the eight members who are left.

15           MS. SCOTT:  Your Honor, we haven't had time to go

16      through that list.  Can we have some time to review this and

17      consult with our clients?

18           MS. YOST, DEPUTY CLERK:  Judge, it's going to take me

19      a few minutes to prepare this.

20           THE COURT:  Sure, sure.  Take the time now.  We're

21      going to get them in the box and do openings before lunch.

22         (Brief pause in proceedings.)

23           THE COURT:  Ladies and gentlemen, if you wish, you may

24      stand up and stretch your legs.  It's going to take a couple

25      minutes here for the lawyers to do a little work, so you're

12:48:16PM 1   certainly welcome to stand and stretch your legs if you wish

2   to.

3        I have to ask to you stay in the room, unfortunately;

4   but if you want to get up and stretch your legs and walk around

5   back there, you may do so.

6        (Brief pause in proceedings.)

7        THE COURT:  Ladies and gentlemen, I had the privilege

8   when I was a lawyer to be selected for jury duty five times.

9   And so I was a trial lawyer; and the first time I did it, I

10  thought:  Wow, I don't really now what I'm going to do.  I

11  don't know anything about the law — I mean about the case in

12  the law.  And it was a criminal case and I was not at that time

13  a criminal defense lawyer or a prosecutor.

14       And it was fascinating because when I came out of it,

15  I realized at the end of the day the jury really gets it right.

16  They spend a lot of time — and you don't know this; it's not a

17  town hall.  I don't know if you know that.  You don't get to

18  ask us questions.  You sit there and you listen and you're very

19  patient and you take notes, and — there's only eight of you.

20       And so I am amazed; you would think if you put eight

21  people in a room, you would have eight different views — or

22  you could.  And sometimes you do.  But most times the jury

23  comes out and you hear the same thing.  Because you don't ask

24  questions, right?  And during the course of the trial you're

25  absolutely forbidden to be talking to each other about the

12:51:55PM 1    case.  It's not like you're comparing notes each night.  It's

2    not like you're out on Google at night looking these people up.

3    You're not allowed to.  You're prohibited by your oath from

4    doing that.

5         So the minute I turn the case to you and you walk back

6    with the madam deputy is the first time you talk about it.  And

7    I was amazed.  All five times — you can't believe, five times,

8    right?  I must be the most unlucky citizen, you know, in that

9    sense.

10        But I enjoyed each one of them not because I lost time

11   from work and all that, but because I really was fascinated

12   with how the group dynamic works.  You are one-eighth of a

13   brain.  So if one person goes up and goes to the restroom, the

14   other seven can't talk about the case.  So you talk about

15   everything else, right?  You talk about everything else.  But

16   you don't talk about the case.

17        And so whenever we came together in that room for that

18   day for deliberations, I was shocked.  Each five times I was

19   shocked that within a couple minutes we all said:  Oh, did you

20   hear that?  Remember that?  Now we went through all the

21   evidence, but the recollection was similar.  And that's why I

22   think juries are so magical.  Because you don't get to say

23   anything.  You take notes.  But you all remember different

24   things.  You know?

25        You watch how a witness answers a question.  You watch

12:53:08PM 1    how — if they're believable or not.  I know a little bit about

2    each of you, about as much as you know about me; and I know you

3    all come from different parts of the western district.  You all

4    come from different types of families, different types of

5    occupations and jobs.

6             And I think this is absolutely — I think if you get

7    in this room, it's the only time in your life where you can —

8    where you have the ability to affect people's lives so

9    dramatically — unless of course you're a physician, you know,

10    or something, or a police personnel where you're saving

11    someone — but in this context you are addressing it and you're

12    addressing it with eight other people.

13             I know I sound like I'm on a soapbox here, but I say

14    it to you because those of you who are hesitant and hoping —

15    have your fingers crossed out there — I know what you're

16    doing; I've been there.  But I assure you — and juries I've

17    had here in Pittsburgh have all said the same thing afterwards,

18    that they're amazed at how it works between the eight of you.

19             So I appreciate the patience you're showing with the

20    lawyers.  They are good lawyers and they have a job to do for

21    their clients right now.  And the last thing I'm going to tell

22    you, you all think it's jury selection, right?  You think

23    they're picking.  You know what I mean?  You think they're

24    selecting.

25             What's actually going on — I'm not telling you any

12:54:37PM 1   secrets of lawyers -- is they're deselecting.  That is we

2   remove people, not for any reason -- for any reason.  We have

3   the right, just as if you were sitting there; you have the

4   right to ask and remove.  So it's not a test.  Okay?

5         If you get on, you did well; if you get off, you did

6   well.  You have no ability to know what the teacher wants.

7   Right?  So don't take it -- don't hope you can sit a certain

8   way or, you know, look a certain way and you're going to get

9   off.  There's no secret to this.  It's -- anybody see the

10   show -- there was a show on TV called Bull.  It's a show now

11   about jury selection.  And it's fantasy.  Let me say that to

12   you.  It's fantasy.

13         But when you sit there, and now that you sit there, I

14   urge you after you've done your jury service one night just

15   turn it on.  And you'll say:  Oh, my gosh.  How unrealistic.

16   But the secret of it is -- is how significant you are to these

17   people.  And that's true about the law, how significant you

18   are.  And that's something I give you great credit for being

19   here today.

20         We'll take a moment and we'll start the next process.

21   And afterwards, when you're done, you can certainly ask me any

22   questions; but during the course of it I can't answer any

23   questions because, as you're going to find out, I answer to you

24   as well.  The United States Constitution has me in charge of

25   the law, but you're in charge of the trial in that sense, so I

12:56:11PM 1   answer to you.

2            So we're going to do things to make your life easier,

3   not to make my life easier, not to make the lawyers' life or

4   the clients' life easier.  We're here to make your life easier

5   because you are the judges.  Once you are sworn, you are

6   constitutional officers and so it's your job to get it right.

7   We're going to make everything possible to help you get it

8   right.

9            MR. LIEBER:  We have an illegible form that didn't

10   copy.

11            MS. YOST, DEPUTY CLERK:  It's the same one; it's not

12   going to copy correctly.

13       (Off the record discussion.)

14

15            THE COURT:  Counsel, has each of you had a chance to

16   he see the final list?

17            MR. LORENCE:  Could we look at it again, Judge?  I saw

18   it; I don't think they did.

19            MR. LIEBER:  That's okay.

20            THE COURT:  The same list that was just handed down to

21   them, did you see it?

22            MR. LIEBER:  That's fine.

23            THE COURT:  Did you see it?  Because I want to make

24   sure.  I'm about to read them out.

25            MR. LIEBER:  Let me come back up then — thank you.

1:13:41PM 1    THE COURT:  Sure.

2   (Brief pause in proceedings.)

3    THE COURT:  Madam deputy, would you kindly take the

4 list and call the members of the jury who will serve in this

5 cause.

6    MS. YOST, DEPUTY CLERK:  Yes, Your Honor.

7    I'm going to be calling you by your badge numbers, not

8 the index card number, your badge numbers.

9    So Juror No. 144, please come forward.  You are now

10 going to be Juror No. 8.

11    JUROR NO. 8:  Okay.

12    MS. YOST, DEPUTY CLERK:  Back row, count four back.

13    Juror No. 48, please come forward.  You are now Juror

14 No. 7.

15    Juror No. 111, please come forward.

16    MS. SCOTT:  Your Honor, may we approach?

17    THE COURT:  Certainly.

18   (At side bar.)

19    THE COURT:  What's the concern?

20    MS. SCOTT:  I must have made a mistake.  I thought

21 someone who's just been called —

22    THE COURT:  I don't know what to tell you.  I don't

23 know how to remedy that.  The third Circuit is pretty clear on

24 this.

25    MS. SCOTT:  But we haven't done anything.  I don't

1:15:56PM 1  understand —

2          THE COURT:  We haven't sworn them, but the problem is

3  you made your choices.

4          MS. SCOTT:  But I haven't made my choice.  I made my

5  choice and obviously there's a mistake that I will agree that I

6  must have made, but I don't know how I made it because I know

7  that who I intended to be my first strike is now sitting on

8  this jury.

9          THE COURT:  What do we do now?  The Third Circuit is

10  clear.  Once you choose the people in the panel — the problem

11  is that's why I said look at it.  You looked at it, you turned

12  it over.  And I don't know what to tell you.  The people now

13  know — we have to come back tomorrow —

14          MS. SCOTT:  Your Honor — this is my first strike.  I

15  ask you, please, I would —

16          THE COURT:  I don't know what to do —

17          MS. SCOTT:  I would ask you to take into account —

18          THE COURT:  Here's what I'm willing to do.  I'm going

19  to give you a lunch break to check Third Circuit law.  It's

20  against you.

21          MS. SCOTT:  I understand that, Your Honor, but we're

22  so at the beginning of this —

23          THE COURT:  That's not what the Third Circuit says. I

24  understand what you're saying.  I understand how Draconian it

25  is.  The problem is if there was — I think the case law used

1:16:54PM 1    to be -- I'm going to give you a lunch break to look at it.  I

2    think the case law used to be until they're sworn, that's one

3    issue, that's true; I can excuse them.

4           But the problem we have now is you now have the other

5    people who are behind them or may be behind them knowing that

6    they've not been selected, so now you have --

7           MS. SCOTT:  I will pick somebody after her.

8           THE COURT:  That's not the problem.  They relied upon

9    it.  You have to do a new voir dire.  You would have to come

10    back tomorrow and do a voir dire.  You have to cut short -- you

11    have to cut your trial short a day.

12           MS. SCOTT:  I will do that.

13           MR. LIEBER:  We would object to doing that.

14           THE COURT:  I know.  But I'll give you -- it's 12:15.

15    We've been here since 8:15.

16           MS. SCOTT:  All right.

17           THE COURT:  Let me give them a lunch break; you check

18    with Third Circuit case law.  And if you find something, I'll

19    let you do this.  I don't think you can.  If you can find

20    something that says after both sides have relied upon -- that's

21    why I say look at this again.  I don't know if you can.

22           MS. SCOTT:  Thank you, Your Honor --

23           THE COURT:  You can't beg me; I don't know I have the

24    discretion.

25           MS. SCOTT:  We don't have computers here.  We don't

1:17:49PM 1    have access to do —

2                     MR. LORENCE:  I'll let you use my Mac here, you can

3        research the law.

4                     THE COURT:  I don't know.  I'm just basing it on —

5        I'm not saying I know the law either.  I know what the tone of

6        the law is.  It's very harsh because both sides have relied on

7        this voir dire and picked their eight.  The question is that I

8        have to strike the venire and start over again, unless there's

9        another 30 downstairs — maybe not.

10                    MS. SCOTT:  But there might be.

11                    THE COURT:  But that's not what the Third Circuit

12       says, ma'am.

13                    MS. SCOTT:  Right.  Well —

14                    THE COURT:  I'm tied by the Third Circuit, you know

15       that.

16                    MR. LORENCE:  She can use my MacBook Air.  The

17       Internet connection here is —

18                    THE COURT:  I have Internet access, too.

19                    MS. YOST, DEPUTY CLERK:  We also have a law library on

20       the fifth floor.

21                    THE COURT:  Yeah.  I empathize with what you're

22       saying.  I just don't know what to tell you.  I think once the

23       other side has relied on your selection —

24                    MS. SCOTT:  Your Honor, the thing that messed me up, I

25       think, was the new — these are re-numbered.

1:18:43PM 1        THE COURT:  Don't go there.

2        MS. SCOTT:  Well, I don't mean to.

3        THE COURT:  You're a professional.  You're a

4 professional.  Don't go there.

5        MS. SCOTT:  I'm fully taking responsibility.

6        THE COURT:  I know, I know.

7        MS. SCOTT:  I really am.  And in 25 years of practice

8 in law this has never happened to me.

9        THE COURT:  Because I don't think it can.

10        MS. SCOTT:  I've never made a mistake like this.

11        THE COURT:  I know.  I think — I think I'm not —

12 again, the problem I have now is I'm going to put the others in

13 the box, okay?  And then I'm going to say:  Ladies and

14 gentlemen — we're not going to swear them.  I'm going to say:

15 Ladies and gentlemen, I'm going to excuse you.  I'm going to

16 give you 'til 1:00 to figure it out.  We've had these people up

17 and down.  And if we send them home, we'll send them all home

18 and come back tomorrow morning at 9:00 and we'll start over

19 again.

20        MS. SCOTT:  Yes, Your Honor.

21        THE COURT:  The problem we have is — I'm not saying

22 yes.  I'm saying I have to see the case law.  I think the case

23 law is really bad for you because I think they relied upon the

24 voir dire.  This is not an issue where you didn't know who this

25 person was, you just misstruck.

1:19:35PM 1          And I want the record to reflect that from my
        2   experience this was an inordinately long striking period for a
        3   jury selection; but we don't show time on these things, but
        4   that was an inordinately long time for both sides.  For both
        5   sides it's a big case and I don't disregard that.  It's not
        6   like we sat her and said go, go, go.  So let's — so we'll
        7   empanel the next five, take the lunch break, and then we'll see
        8   if you have any case law that helps you with that
        9          MS. SCOTT:  Where can we go to do legal research?
       10          THE COURT:  There's a law library here.
       11          MS. YOST, DEPUTY CLERK:  The law library's on the
       12   fifth floor.
       13          MS. SCOTT:  Is it open to the public?
       14          MS. YOST, DEPUTY CLERK:  Yes.
       15          MS. SCOTT:  I don't know; I've never been there.
       16          MR. LORENCE:  They have computers there, too.
       17          THE COURT:  Use your — yeah, yeah.  We have WiFi
       18   here.
       19          MS. SCOTT:  Okay.
       20          THE COURT:  So we'll do that.
       21          MR. LORENCE:  Thank you, Judge.
       22          THE COURT:  Sure.
       23      (In open court.)
       24          THE COURT:  Thank you, madam deputy.
       25          MS. YOST, DEPUTY CLERK:  Your Honor, may I continue?

1:20:37PM 1          THE COURT:  Please.

2          MS. YOST, DEPUTY CLERK:  Just so the record is clear,

3   Juror No. 111, you are Juror No. 6.

4          No. 73, please come forward.  You're now Juror No. 5.

5          Juror No. 457, please come forward.  You're now Juror

6   No. 4.

7          Juror No. 22, please come forward.  You are now Juror

8   No. 3.

9          Juror No. 132, please come forward.  You are now Juror

10   No. 2.

11          And Juror No. 117, please come forward.  You are now

12   Juror No. 1.

13          THE COURT:  Thank you, ladies and gentlemen.  You've

14   all put in a long morning.  And before I swear this jury, I'm

15   going to excuse all of you for a break — I'm going to excuse

16   the eight selected jurors for a break until 1:00.  The madam

17   deputy will direct the remainder of you as to what

18   responsibilities you have for the remainder of the day to the

19   court.  But let me again reiterate the civic lesson.  Thank

20   you.

21          If you're not here, this doesn't work.  You showing up

22   and fulfilling your civic duty is a tremendous tribute to you

23   and your Constitution and the service that you provide and,

24   frankly, to the people here in the western district of

25   Pennsylvania.   So thank you very much for being here.

1:22:51PM 1          Madam deputy will excuse you and then I will excuse

2     the eight members of the panel in a moment.

3          Madam deputy.

4          MS. YOST, DEPUTY CLERK:  All rise, this court is now

5     in recess.

6        (Remainder of the jury panel exits the courtroom.)

7          THE COURT:  Ladies and gentlemen of the jury, I have

8     to wait one moment for the madam deputy to give you your

9     instructions, so she'll be right with us.

10          There is a — by way of anecdote, there is a — I

11     understand there is a place on the first floor now, a small

12     snack bar; but in addition, madam deputy will give us the

13     instructions.

14          MS. YOST, DEPUTY CLERK:  Take them upstairs?

15          THE COURT:  Yes, and give them the instructions

16     accordingly until 1:00 all right?

17          Thank you very much.

18          Counsel, I'll see you shortly before 1:00.  Thank you

19     very much.

20        (Whereupon, a luncheon recess was taken from 12:20 p.m. to

21     12:55 p.m.)

22        (The remainder of the day's proceedings are bound in a

23     separate transcript.)

24

25

1:24:24PM  1                    C E R T I F I C A T E

2       I, Shirley Ann Hall, certify that the foregoing is a correct

3       transcript for the record of proceedings in the above-titled

4       matter.

5

6                                    s/Shirley Ann Hall
                                     Shirley Ann Hall, RDR, CRR
7                                    Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25